'Scott, J.
The original suit between these parties, upon its decision by this court, as reported in 1 Ohio St. 603, was taken to the Supreme Court of the United States by a writ of error, issued under the 25th section of the judiciary act of Congress, and the judgment of this court was by that tribunal reversed. 16 How. 369.
The questions arising in the case, and the opinion of this court upon them, were such as to bring it within the cognizance and jurisdiction of the Supreme Court of the United States, unless we assume the position that that tribunal has no jurisdiction to review .any decisions whatever of the *state courts, on questions re- [343 lating to the conflict of a state law with the constitution of the United States. The theory upon which such a position must rest, a majority of this court is not prepared to adopt. We do not mean to say that in a case of clear usurpation, by the Supreme Court of the United States, of an authority and jurisdiction wholly unwarranted by the federal constitution, it would not be competent for this court, as a court of last resort in a sovereign state, to decline obedience to a mandate issued in the exercise of such usurped jurisdiction. ' But no such case is before us. On the contrary, the jurisdiction here claimed has been constantly exercised by the Supreme Court of the United States ever since the organization of the general government, with the general acquiescence of the state courts. In conformity, then, with what has heretofore been the uniform practice in this state, we direct the mandate to be entered.
The provision of the constitution of the United. States, expressly conferring appellate jurisdiction on the Supreme Court, does not authorize the exercise of appellate power by that tribunal over the state courts, but extends simply to appeals from the subordinate federal courts.
There is no provision in the constitution from which a supervising power in the Supreme Court of the United States over the state courts can be derived, by way of incident or implication.
The Supreme Court of the United States has not been constituted the exclusive-tribunal of last resort, to determine all controversies in relation to conflicts of authority between the federal government and the several states of the-Union.
The state courts and the federal courts are co-ordinate tribunals, having concur-344] rent '''jurisdiction in numerous cases, but neither having a supervising power over the other; and where the jurisdiction is concurrent, the decision of that court, or rather of the courts of that judicial system, in which the jurisdiction first attaches, is final and conclusive as to the parties.
Under our system of government, a power not conferred by the constitution can . not be acquired by repeated acts’of usurpation.
Mere precedent or practice can not be relied upon as settling a fundamental principle, in respect to which no question was made or passed on.
Brinkerhorr and Bowen, JJ., concurred.
Swan, J., having formerly been of counsel in this case, did not participate in its decision.
Bartley, C. J., dissented. Syllabus of his dissenting opinion:
This case is before us on a motion to enter a special mandate from the Supreme Court of the United States, reciting a judgment of that court, purporting to reverse the judgment of this court, and commanding us to enter a judgment contrary to our own adjudication, and to carry the judgment of reversal into execution, under the authority of the judicial power of the United States. The Supreme Court of the United States claims to have acquired jurisdic- - tion over the case, by writ of error, under the 25th section of the judiciary act of Congress, of the 24th of September, 1789. The case originally came before us on a proceeding to enforce the collection of the taxes of the state, assessed on the property of the corporation, for the year 1851, pursuant to the statute “to tax banks, and bank and ■other stocks, the same as the property of other persons.” The bank, in this case, claimed to bo exempt from an equal assessment of taxes, by a provision in the bank law of this state, enacted in 1845, from which it derived its franchise, and *345, 346 which authorized a tax of six per cent, on the profits of the banks, which provision is claimed to be in the nature of a contract. This court, however, in giving a construction to this provision in the law of 1845, decided that it was not a contract, and that the bank was not thereby entitled to an exemption from liability to equal taxation, when required by the laws of the state. The Supreme Court of the United States, however, as it appears *from this man- [345 date, has given a different construction to this statute of Ohio of 1845, and declared it to be a contract, whereby the state had surrendered to the banks a part of the power of taxation, and that therefore the subsequent statute of the state, passed in 1851, imposing an equal burden of taxation on the banks, was unconstitutional and void, on the ground that it impaired the obligations of a contract, by repealing the tax provision in the bank law of 1845. •
The questions arising under this motion acquire incalculable importance from the vast consequences which they involve. Some fifty banks in the state, with an amount of taxable property exceeding twenty millions of dollars, claim an exemption from the power of taxation, under this decision of the Supreme Court of the United States. The tax law of 1851 is a mere state revenue law, in no way whatever affecting the operation of the federal government, and wholly unconnected with the affairs of the United States; and the bank law of 1845 is of the same character. If the judiciary of the state be not competent to interpret and enforce the constitution and laws of the state, especially in regard to mere matters of local state revenue, for the purpose of equalizing the public burdens ; if the Supremo Court of the United States can, by a writ of error, or appeal, take such a case from the judicial power of the state, and upon a mere question of giving a construction to the statuses of the state, not only reverse'the judgment of the Supreme Court of the state, but also use the judicial power of the state as its agency to enforce its mandate, the idea of such a thing as state sovereignty under our system of government would be a deceptive fallacy, and the states of the Union nothing more than mere municipal corporations, belonging to a consolidated national government.
*And this extraordinary claim to supremacy in the supreme [846 federal court has been carried a step further, and become even more alarming in its consequences, by the more recent decision, in the case of Dodge v. Woolsey, 18 How. 362, in which that tribunal has denied all remedy, or power of regeneration, even to the people of *347 the state, acting in their original capacity, by the formation of a new constitution, to correct such abuses of legislation creating inequality and injustice in the burdens of taxation.
The general scope of this doctrine is forcibly portrayed in the very able dissenting opinion of Mr. Justice Campbell in the case just referred to in 18 Howard; and I take the liberty of referring to that opinion, and of inviting especial attention to it, as a most lucid exposition of the enormities and alarming import of the doctrine.
This doctrine of the Supreme Court of the United States not only wholly prostrates the municipal sovereignty of the people within the state, heretofore supposed to stand on the fundamental principle of our American institutions, but it also places the charters of corporations above the constitution of the state, and makes their special privileges and exemptions paramount to the original right of the people to form and remodel their own state government. The fatal tendency of this bold and dangerous assumption of power demands a foai'loss and searching inquiry into the claim of authority upon which it rests. And the magnitude of the subject, and portentous consequences threatened, will justify that research and detail in its examination which may provoke the charge of prolixity from those who prefer a more superficial investigation. Indeed, it would be futile to attempt to contend against the weight of authority on which this doctrine is claimed to stand, without giving the subject a full, thorough, and searching examination.
*1 proceed, then, to the inquiry: Does the constitution confer any power on the federal government by which the Supreme Court of the United States is authorized, in the exercise of its appellate jurisdiction, to review and reverse the judgment of a state court?
It can not be pretended that Congress can confer this pow;er by statute, without a delegation of authority in the constitution. Under our system of government, a lan' originating in an exercise of power not given by the constitution, is void. The United States is a government of expressly defined and limited powers, and all powers not delegated in the constitution are expressly reserved. It wouúl be to little purpose, indeed, that the people should expressly definó- and limit the powers of their government by a written constitution, if the limits prescribed could be passed by those intended to be restrained, and laws enacted without authority derived from the constitution. “This doctrine,” in the language of Chief Justice Marshall, in the case of Marbury v. Madison, 1 Cranch, 137, “ would *348 •subvert tbe very foundation of all written constitutions. It would declare that an act which, aceordiug to the principles and theory of our government, is entirely void, is yet, in practice, completely •obligatory. It would declare that if the legislature shall do what is expressly forbidden, such act, notwithstanding the express prohibition, is in reality effectual. It would be giving to the legislature a practical and real omnipotence, with the same breath which professes to restrict their powers within narrow limits. It is prescribing limits, and declaring that those limits may be passed at pleasure; and thus reducing to nothing what we have deemed the greatest improvement on political institutions — 1 a written constitution.’ ” It is incontestible, therefore, that if this power be not conferred by the constitution, it can not be legitimately exercised.
We may here premise, that it is a settled rule of *interpre- [348 tation, founded on sound reason, that every written instrument conferring limited and expressly defined powers, must be strictly construed; and that, to warrant the exercise of special authority thus delegated, the grant of it must appear affirmatively and distinctively to be within the terms of the prescribed limits. If this rule bo important in any instance, it is so in its application to the written constitution of a government of limited and expressly, defined powers. If the exercise of doubtful authority, derived by vague and far-fetched construction and implication, be warranted or allowed, a written constitution will be Of but little consequence as a restraint upon ambition and cupidity. The rigid application of the strict rule of construction above mentioned, is also authoritatively required by the ninth and tenth additional amendatory articles of the constitution, declaring that all powers not expressly delegated are reserved, and that the enumeration of certain rights in the constitution shall not be construed to deny or disparage those retained. Without this express requirement of a strict construction, the constitution would not have been adopted by the states.
Bearing in mind, therefore, this rule of interpretation, we will proceed directly to an examination of the question under consideration.
The whole judicial power of the federal government is conferred by the third article of the constitution. The first section of this article prescribes the courts in which this judicial power is vested, in the words following:
*349 “The judicial power of the United States shall he vested in one Supreme Court, and in such inferior courts as the Congress may from time to time ordain and establish. The judges, both of the supreme and inferior courts, shall hold their offices during good behavior, and shall, at stated times, receive for their services a compensation, which shall not be diminished during their continuance in office.”
The second clause of the second section of the article *distributes the jurisdiction under which this judicial power is to be exercised, as follows:
“ In all cases affecting ambassadors, other public ministers and consuls, and those in which a state shall be a party, the Supreme Court shall have original jurisdiction. In all the other cases before mentioned, the Supreme Court shall have, appellate jurisdiction, both as to law and fact, with such exceptions, and under such regulations as the Congress shall make.”
These two provisions contained in the same article, and closely connected in their relation to the same subject-matter, must bo construed together. The whole jurisdiction conferred is vested in the Supreme Court of the United States, and the inferior courts established by Congress. None of the judicial power of the United States, therefore, can be exercised by any other courts, than the courts of the United States. No other courts but these are mentioned in this article; and clearly none other could have been in-contemplation. In a few specified cases only, is original jurisdiction given to the Supreme Court; as to all other cases, the jurisdiction of that court is appellate. An appeal is the removal of a suit from the determination of an inferior court, to the jurisdiction of a superior court, under the same judicial system. It is a continuation of the same suit under the judicial power of the same government, but under the jurisdiction of a higher court than that in which it has been once' decided. Appellate jurisdiction is the cognizance which a superior court takes of a case removed to it, by appeal or writ of error, from the decision of an inferior tribunal. The power of the appellate court necessarily includes the power not only to reverse the judgment, but also to control and direct the subsequent action of the subordinate court. Appellate jurisdiction, therefore, always implies the existence of subordinate court-, in the same judicial organization, over which the court, in which it is vested, *350, 351 exercises a supervising or correcting control. The appellate jurisdiction, which is here vested in the Supreme *Court of the [350 United States, is conferred in the same constitutional provision which authorizes the establishment of the inferior federal courts, as well as the Supreme Court; and of course has a direct reference-to appeals from the inferior federal courts,,being the subordinate-courts under the same judicial organization. No other courts, than-, the United States courts, are mentioned, or even alluded to, in this-article of the constitution; and none other, could have been contemplated. This constitutional provision is the fundamental law for the organization of a judicial system. It vests all the judicial power of the government in a Supremo Court and certain inferior courts belonging to this judicial organization. No other judicial system is mentioned. The constitution contains no provision creating any connection between this and any other judicial organization. "When, therefore, this constitutional provision distributes the-judicial power of this system, by vesting appellate jurisdiction in the Supreme Court, it would be a gross absurdity to say that this appellate jurisdiction could have reference to anything else than appeals from the inferior tribunals here mentioned as belonging to-the same system, and which are essential to make up the organization of the courts in which the whole judicial power of the United States is vested.
"Where a constitution organizing fundamentally a judicial system, divides it into one supreme and so many inferior courts as the legislative branch of the government may ordain and establish, then enumerates its powers, and proceeds so far to distribute them, as to. define the jurisdiction of the Supreme Court, and to confer upon it appellate jurisdiction, the plain import of the words is to confer-jurisdiction, or a supervising control by appeal or writ of error,, over the judgments of the subordinate tribunals here mentioned- and established in the same connection, as apart of *thesame [351 organization. If the appellate jurisdiction here conferred had reference to any other subordinate courts, than those mentioned in this provision of the constitution, language would certainly have-been used expressly including them. The judicial system of each state being different and distinct from that of the federal government, and ordained and established under a different constitution— originating from a different source, and distinct in its organization, is also clothed with independent judicial power, derived from the- *352 ■people of the state, and -wholly distinct from the judicial power of the United States. If the appellate jurisdiction, conferred on the .Supreme Court of the United States, had reference to the removal ■ of cases, by writ of error or appeal, from the state courts, as well .as the inferior federal courts, it is fair to infer, that the express mention of them would not have been omitted ; and the state courts, not having been mentioned as subject to this appellate power, are •excluded by a well-settled and universal rule of interpretation. Each of the states has always claimed to be sovereign and independent, and at the time of the formation of the constitution of the United States, each state was especially jealous of encroachments • on its state sovereignty by the powers delegated to the federal government. It is certainly, by no fair or reasonable mode of interpretation, that the language of the constitutional provision above recited, could make the courts of the state subject to the supervising •control, or the appellate power of the Supreme Court of the United States, without the mention of them, or language clearly and expressly including them.
But it has been argued, that the language of the constitution, ■conferring appellate jurisdiction on the Supreme Court of the United States, is not expressly limited by reference to any particu352] lar subordinate courts, but general, *and restrained only by “ such exceptions, and such regulations, as the Congress shall makeand that, therefore, the language of the constitution does not limit this appellate power to the inferior federal courts'. This .argument overlooks one of the plainest and most common rules of interpretation. The language of every instrument must be construed with reference to the connection in which it is used, and the ■ context and subject-matter to which it relates. The article of the constitution, in which this appellate jurisdiction is conferred, establishes a separate, distinct, and independent judicial system, vests the whole judicial power of the federal government in the federal • courts, provides for a Supreme Court and the inferior courts of the system, and in tjie distribution of the jurisdiction, confers appellate jurisdiction on the Supreme Court. "Was it necessary to say, in so many words, that the appellate jurisdiction, hero conferred, applied only to proceedings in the subordinate tribunals here mentioned and provided for — the tribunals belonging to the judicial ■ organization in this connection established — tribunals exercising judicial power here conferred, a part of which, and indeed a mere *353 continuation of which, after the commencement of its original exercise, is the appellate jurisdiction under consideration ? It is clear,, that words specifically applying this appellate jurisdiction to the proceedings of these subordinate courts of the same organization, could not have made this constitutional provision plainer than it is. No other courts or judicial system is in any manner referred to, or-even recognized as having an existence. This grant of appellate jurisdiction, therefore, taken in the connection in which it stands, has as plain and clear an application to the supervising control over the subordinate federal courts alone, as express language could make. Such is the fair and reasonable import of the whole article; and any other construction would *not only violate a settled [358 rule of interpretation, but be at variance with reason and plain common sense.
The constitutional provisions, for the establishment of the several judicial systems for a number of "the states, furnish practical illustrations of the interpretation here given to the constitution of the United States. The first- section of the fourth article in the constitution of Ohio is as follows :
“ The judicial power of the state shall be vested in a Supreme-Court, in district courts, courts of common pleas, courts of probate, justices of the peace, and in such other courts inferior to the Supreme Court, in one or more counties, as the general assembly may from time to time establish.”
The second section of the same article continues:
“The Supreme Court shall consist of five judges, a majority of' whom shall be necessary to form a quorum, or to pronounce a decision. It shall have original jurisdiction in quo warranto, mandamus, habeas corpus, and procedendo, and such appellate jurisdiction as may be provided by law.”
Here a Supreme Court and certain subordinate courts are created, and in the distribution of the judicial power, appellate jurisdiction-is conferred on the Supreme Court in general terms, without expressly mentioning the subordinate courts over whose proceedings-it shall be exercised. The provision here is substantially the same with that in the constitution of the United States in regard to the appellate jurisdiction. But did any one ever doubt, as to the subordinate courts, to which the appellate jurisdiction here conferred. *354, 355 •was applicable?' Was it ever supposed that it could be extended beyond the subordinate courts mentioned in the same connection, and authorized under the same judicial system ? What would bo :Said of a legislative enactment in Ohio authorizing an appeal, or writ of error, from the subordinate federal courts sitting within the state to the Supreme Court of the state? Would the Supreme •354] .Court of the United States — a tribunal which has never *been wanting in a disposition, at least, to protect, to the utmost extent, the powers of the federal judiciary — acquiesce in such an interpretation of the constitution of Ohio ? It certainly would not. And yet the language of the constitution of the state, and the relation of the •state to the federal government, would justify such an interpretation, and sustain such appellate power in the state court upon the very same ground upon which this appellate power, claimed for the ‘Supreme Court of the United States, rests.
The judicial system of each state is entirely distinct from that • of the federal government, and the judicial power of the federal government being wholly distinct from the judicial power of each state, the former can not be blended with the latter. All the judicial power vested in the federal government must, from the very nature of the grant, be original, or capable of original cognizance, • of any case commenced under it. Without original, there can bo no appellate jurisdiction. The latter is a mere continuation of the . judicial power originally acquired, or taken, over the rights of the parties in a suit. The authority given to Congress to ordain and establish inferior courts, to any extent deemed proper, was evi.dently intended to enable the federal government to provide subor.dinate tribunals, in each of the states, competent to take original -cognizance of all matters of federal jurisdiction within its limits, so far as the same might become necessary. The state courts were not relied on as a means of exercising any of the judicial power • of the United States, and no portion of it was vested in them by the constitution of the United States. It has been settled by solemn adjudication that Congress can not, by law, impose jurisdic- ■ tion on the state courts, nor can the legislature of a state impose jurisdiction, on the United States courts. The exercise of appellate juiisdiction, therefore, by the Supreme Court of the United States :355] over the state *courts’is not only not provided for in the constitution, but incompatible with the theory of our government .and the distribution of power under it. Hence the express pro *356 vision in the constitution that “ the judicial power of the United-Mates shall be vested in one Supreme Court, and in such inferior courts -as the Congress may ordain and establish ” — thus confining the judicial power of the federal government to the federal courts by express provision.
But it is insisted that the power of the Supreme Court of the United States, to control the judgments of the state courts, is acquired by virtue of the first clause, of the second section, of the third article of the constitution, which is in these words:
“ The judicial power shall extend to all cases in law and equity, arising under this constitution, the laws of the United States, and treaties made or which shall be made under their authority; to all cases affecting embassadors,'other public ministers, and consuls; to all cases of admiralty and maritime jurisdiction ; to controversies in which the United States shall be a party; to controversies between two or more states; between a state and citizens of another state; between citizens of different states; between citizens of the same state claiming lands under grants of different states, and between a state, or the citizens thereof, and foreign states, citizens, or subjects.”
The effect of this provision is not to confer appellate jurisdiction, but to define the objects, and limit the extent of the judicial power of the United States. The judicial power mentioned is of course the judicial power of the United States as distinguished from that of the several states ; and it is extended only to the subjects specifically enumerated; so that the federal courts are courts of limited, and not courts of general jurisdiction. Their jurisdiction is to “ extend ” to all cases arising out of the several matters specifically enumerated. There is no expression used, to give the judicial power here conferred any exclusive character. The term “ extend” means to stretch, reach, or continue in *any particular direction [356 (Webster’s Ditionary). There is no meaning in the word “ extend,” which carries with it the exclusion of anything else, extending to the same matter. It is in the nature of the jurisdiction of courts of justice, that it never operates till it is invoked by the institution •of a suit or other proceeding in court. When, therefore, the judi ■ cial power is extended to any particular subject, it is simply empowered to take jurisdiction over it, whenever it is invoked by the commencement of a suit or other proceeding. Had the of the constitution been as follows: The courts of the *357 'United States shall have jurisdiction in all cases brought before them touching the several matters mentioned, instead of the language used, it is very clear that the same, and no different meaning, would have-been expressed. The state courts, are not mentioned nor referred to, nor do they appear to have been in contemplation, from any language used. The bare extension of the judicial power to all cases, or which is the same thing, to all suits or proceedings which may be instituted, invoking its action touching the enumerated subjects, does not give an exclusive character to the power granted, so as to exclude the concurrent jurisdiction of co-ordinate tribunals.
The object of a written constitution is to enumerate, and distinctly describe the power delegated by the people to the government, so that they may’not be left matters of doubt or conjecture. Had it been the intention of the constitution to exclude the concurrent jurisdiction of the state courts, in the cases to which the-judicial power of the United States is extended, language would certainly have been used clearly manifesting such intention. But as no such words are employed, and all powers not expressly conferred are reserved by the very terms of the constitution, it is-plain and certain that no such exclusive jurisdiction is given by the constitution to the federal courts.
*A redundancy of learning has been expended on the words “ all cases in law and equity, arising und%r the constitution, laws, and’ treaties of the United States," -to which the federal jurisdiction is-extended. There is no occasion for any strained interpretation, or search for far-fetched meaning to ascertain the plain import of the language used. What constitutes “ a case ” in law or equity, arising under the constitution, etc., is matter of legal' interpretation. A case in law or equity is a suit or proceeding in court, invoking-the exercise of judicial power, and consisting as well of the parties as of their rights. There is a manifest distinction between a question in law or equity, and a case in law or equity. Although every case in law or equity involves a question, yet many questions may arise seriously affecting the rights of persons, which do not constitute a case in law or equity. It appears that Chief Justice Marshall, when a member of Congress, in a debate in relation to the famous case of Jonathan Robbins, gave an exposition of the term, 11 a case in law,” as used in the constitution, in the following words:
*358 “ By the constitution, the judicial power of the United States is extended to all cases in law and equity arising under the constitution, laws, and treaties of the United States ; but the resolutions declare the judicial power to extend to all questions arising under the constitution, laws, and treaties of the United States. .The difference betwoeu the constitution and the- resolutions was material and apparent. A case in law or equity was a term well understood, and, of limited signification. It was a controversy between parties that had taken a shape for judicial decision'. If the judicial power extended to every question under the constitution, it would involve almost every subject proper for legislative discussion and decision : if to every question under the laws and treaties of the United States, it would involve almost every subject upon which the executive could act. The division of power, which-the gentleman had said could exist no longer, and the other departments, would be swallowed up by the judiciary. By extending the judicial power to all cases in law and equity, the constitution had never been understood to confer upon that department any political power whatever. To come within this description, a question must assume a legal form for forensic ^litigation and judicial decision. There [358 must be parties to come into court who can be reached by its process and bound by its power; whose rights admit of ultimate decision by a tribunal to which they are bound'to submit.” 5 Wheat., Appendix.
This interpretation is unquestionable. Gases in law and equity, within the meaning of the constitution, therefore, are suits or proceedings in court requiring the exercise of judicial power. And as this article of the constitution refers to, and has in view, no courts hut the federal tribunals, it is manifest that the language, “ the cases in law and equity arising under the constitution, laws, and treaties of the United States,” comprehends only suits or proceeding instituted in the federal courts, invoking the exercise of the judicial power of the United States. The constitution does not say, that the judicial power shall extend to all questions arising under the constitution, laws, and treaties of the United States. The idea that the judicial power of the United States extends to every question arising under,the constitution, laws, and treaties of the United States, is- not only an absurdity, but an impracticability.
The judicial power acts only when its operation is invoked; and its action is invoked only by a case or suit instituted under its jurisdiction. It is not possible, therefore, for the judicial power to take cognizance of any question, except where a suit or judicial proceeding has been instituted under its jurisdiction, calling it into operation. A case, therefore, within the meaning of the constitu *359, 360 tion, and to which the judicial power of the United States extends, must be, first, a suit or judicial proceeding instituted under the .authority of the federal constitution, invoking the action of the judicial power of the United States; and, second, it must involve ;a question, or relate to a subject-matter pertaining to the constitution, laws, or treaties of the United States, or involve one of the 359] other ^elements of federal jurisdiction, specified in the constitution. Such would be a case arising under the constitution of the United States; and to all such cases, and none others, is the judicial power of the United States extended.
There is, therefore, no foundation for the doctrine that the first clause of the second section of this article of the constitutionJ confers an exclusive jurisdiction on the federal courts over all questions arising under the constitution, laws, and treaties of the United States. And the very claim to appellate jurisdiction in the Supreme •Court of the United States over the state courts, in cases involving the specified subjects for adjudication, is an admission that the state •courts may take cognizance of, and determine such questions, and that the jurisdiction of the federal courts over them is not exclusive. So that it can not be claimed that the language of the constitution ¿attending the judicial power of the United States to all cases ai’ising under the constitution, laws, and treaties of the United States, is ■exclusive.
It is insisted, however, that the state courts, as to these questions, -.are courts of inferior jurisdiction to the federal tribunals, and that, therefore, appellate jurisdiction, as to them, from the state courts, may be given to the federal courts. But, as has already been shown, the appellate jurisdiction of the Supreme Court of .the United ..States is expressly defined by the second clause of this second section, and plainly limited to the supervision of the decisions of the inferior federal courts. And as there is no provision whatever in the constitution giving the federal courts appellate jurisdiction over •the state courts, it follows that, as to these cases, to which the judicial power of the United States is extended, the state courts exercise a jurisdiction, concurrent and not inferior to that of the federal tribunals. And it is inherent in the nature of concurrent jurisdic 360] tion, *that the courts which exercise it are tribunals of coordinate and co-equal authority, and neither can control the determinations of the other by the exercise of appellate power; but the •adjudication of the court in which the jurisdiction first attaches, is *361 •conclusive and final. This is a fair deduction from the provisions in both the state and the federal constitutions. The jurisdiction ■ of the state courts is admitted, and the judicial power of the United ■States is extended to the enumerated cases, but by no language which makes it exclusive. It follows that the jurisdiction of each .is concurrent, and there is nothing in the constitution giving either appellate control over the other. Appellate jurisdiction by either, over the other, would be fundamentally incompatible with the theory and structure of our system of government.
As nothing can be found in the 'third article of the constitution providing the organic law for the judicial system of the United States, which authorizes the exercise of appellate jurisdiction by the federal courts over the state courts, can it be pretended that this extraordinary power can be derived from any other part of the •constitution? There is no provision in the succeeding fourth, fifth, sixth, and seventh articles, even remotely bearing upon it; nor is there anything in the second article which defines the powers of the executive department, in any way relating to the subject. And ■certainly there is nothing to be found among the enumerated powers of Congress, in the first article, to warrant Congress in clothing the federal courts with any such authority. The eighth section of this article, containing the specific enumeration of the powers of ■Congress, authorizes Congress to establish courts inferior to the •Supreme Court; but there is nothing empowering Congress to authorize appeals from the state courts to the-Supreme Court, or to exercise any authority ^whatever over the state courts. The [361 first clause of this section confers the power 11 to lay and collect taxes, duties, imposts, and excises, to pay the debts, and provide for the common defense and general welfare of the United States.” 'The authority here given to raise revenue, with a view to pay debts ■and provide for the common defense and general welfare, clearly contains no grant of judicial power. The most latitudinarian construction heretofore given to the constitution, has not conceded to Congress general discretionary power to pass laws providing for the general welfare. On the contrary, it appears to be settled that this authority of Congress to provide for the common defense and general welfare has relation to the enumerated powers, and can be exercised only pursuant to, and in the execution of, the express powers granted and specifically enumerated.
Where, then, is the authority in the constitution for this appellate *362 power ? Can it be found among the implied powers of the govern ment? The eighteenth clause of the eighth section, article one, cm powers Congress “ to make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this constitution in the government of the United States, or in any department or officer thereof.” This is express authority for the exercise of the incidental powers, and having relation to the express powers, can only be exorcised pursuant to-them. It authorizes the enactment of all laws “proper and necessary ” for the execution of the express powers vested in the several departments of the government. Now, as the express power giving the Supreme Court of the United States appellate jurisdiction, is that which is contained in the third article of the constitution, and has relation only to appeals from the inferior federal tribunals, it follows that the incidental or implied power in relation thereto is lim 362] ited to *necessary and proper laws relating to appeals from the-inferior federal courts to the Supremo Court, and nothing more.
The second clause of the sixth article of the constitution, declaring the constitution, laws, and treaties of the United States, the-supreme law of the land, has been urged in support of the alleged supremacy of the judicial powers of the United States over the state courts. The clause, however, is merely declaratory, and vests-no specific power whatever in the government, dr any of its departments. No one questions the supremacy of the constitution, laws, and treaties of the federal government. This supremacy is not, however, absolute, and is limited to the sphere of the delegated powers of the federal compact. And the state courts are bound to-observe this supremacy in all matters judicially brought before them, as well as the federal courts. This supremacy therefore imposes subjection to the constitution, laws, and treaties of the United-States, but not subjection to the federal courts. The constitution and statutes of each state is the supreme law of the land within the sphere of the state authority; while the constitution, laws, and treaties of' the United States are the supreme law of the land within their appropriate operation. But how can this mere declaratory provision authorize appellate jurisdiction in the federal courts over the state-tribunals ? The very clause of the constitution which contains it, requires that the judges of every state shall be bound by the constitution, laws, and treaties of the United States as the supreme law of the land, anything in the constitution or laws of any state *363, 364 -to the contrary notwithstanding. And the succeeding clause of the •same article requires of the judicial officers of the several states, together with other officers, an official oath to support the constitution of the United States. Although the official oath of the federal ■officers requires the same thing, *yetitdoes not enjoin upon them [363 the duty of supporting the constitution of the several states. Not only, therefore, is no distrust in the state judiciary shown by the constitution, but the fidelity required by the oath of office implies that the determination of matters pertaining to the federal constitution, laws, etc., might occur in the state courts, as well as in the federal courts. And if a revising or controlling power over the state courts in this respect, by the federal courts, had been contemplated, it would undoubtedly have been expressly and distinctly delegated. , But this not having been done, the judicial officers of the several states, as well as the federal officers, are required, under the injunction of an official oath, to observe and support the constitution, laws, and treaties of the United States, as the supreme law of the land.
The existence of appellate power in the Supreme Court of the United States over the state courts, has been argued from its tendency to produce uniformity of decision, and prevent conflict between the adjudications of the state and the federal tribunals. This argument is founded on the supposed utility or beneficial tendency of such a power. It is an argument in favor, rather of the propriety and policy of the power than of its existence; and would be more appropriate on a political question before a convention or legislative assembly, than on a legal question before a court ■of justice. The judicial question before us is a mere question of interpretation, and is to be determined from the language of the constitution, by an application of the known and settled rules of judicial construction. The duty of judicial action does not go beyond this. But it is to be lamented, that the political bearing of questions of mere constitutional interpretation, in our courts, has been, heretofore, a source of too frequent error in this country, leading to determinations making the constitution by construction *what the judges wish it to be, or what they think it ought [364 to be, rather than what it actually is.
The alleged salutary tendency of this appellate power for the purpose of uniformity of decision, has been greatly exaggerated, and made a mere pretense to justify the power in question. For that *365 uniformity is not in fact attained, or in good faith attempted, by the 25th section of the judiciary act of the Congress of 1789. That, act authorizes the appeal, in cases where the uniformity of decision-may exist, and denies it, in cases where the uniformity may not exist. It is only where the decision is in favor of the authority of the state, or against the power of the federal government, that the appeal is authorized. When, therefore, the state court has decided in. favor of the validity of a state law,, on the ground that it is not repugnant to the constitution of the United States, and the Supreme Court of the United States either has already decided, or would decide in favor of the validity of the law, there is uniformity of decision, and yet the appeal in such a case is allowed. On the other hand, where the gtate court decides against the validity of a state-law, and the federal court either has already decided, or would decide in favor of the validity of the law, there is want of uniformity; and yet in that case the appeal is denied. Uniformity of decision is, it would appear, a matter of no importance, providing the decision of the state court be in favor of the authority of the federal government. But where the state court decides to sustain the validity of a state law, there the want of uniformity will justify the federal court in reversing the judgment of the state court! The enormity of this solecism is made even more glaring by the fact, that the judges of the federal courts are under no official oath to-support the constitutions of the several states, against the authority 365] of which they are allowed to decide, while the ^judges of the state courts are placed under the solemnity of that official injunction, to support the constitution of the United States, as well as that of their-state. Yet notwithstanding this, the decision of the court of last resort in a state is, according to this law of Congress, presumed to be right, and therefore final, if it be against the authority of the state,, and in favor of that of the United States; but if the decision be to the contrary, it is presumed to be liable to error; and therefore subject to-revision and reversal in the federal court. This presents the monstrous absurdity in judicial action, of making the judgment of a court of justice final or not, according to the party in whose favor-it may happen to have been rendered ; of making a court the court of last resort, or not, in the determination of a cause, according as it may be decided in favor of one or the • other of the parties. This novel and extraordinary feature in the judicial system of the United States, is founded on a want of confidence in the integrity *366 and fidelity of the state courts, and. only admits that they are to be trusted as impartial, when they decide in a particular way, in other words, in favor of the power of the general government. The manifest effect of this incongruity is to aggrandize the federal government, at the expense of the degradation of that of the severel states.
Upon no ground whatever can uniformity of decision be urged as an argument in favor of the existence of this appellate power. The courts of this county are prone to follow precedents, and sometimes even go too far, for the sake of uniformity of decision. Notwithstanding this, there is often as much want of uniformity in the various decisions of the same court, as it is to be found between the decisions of the courts of the different states, or between? the decisions of the state and the federal courts.
And'there can be no conflict of authority between courts of ♦concurrent jurisdiction, as it is settled that, as between [366 courts of concurrent jurisdiction, the adjudication of the court in which the jurisdiction first attaches, is final and conclusive upon the parties. And in all cases of concurrent jurisdiction in different courts, the plaintiff selects the tribunal in which to bring his suit; and having selected his tribunal, he should abide by the decision. Nor has the defendant any right to complain in such ease, and have another trial in the federal courts, when the decision of the state court is against him. Whether he be a citizen, or mere nonresident, or sojourner in the state, he is bound to acquiesce in the decisions of its tribunals, having subjected himself to this liability by voluntarily putting himself under the protection of its laws.
It has been argued in favor of this appellate power, that appeals were allowed from the state courts to the courts established by Congress, under the articles of confederation of 1778, an instrument which, as it has been said, encroached far less on the sovereignity of the states than the present constitution. The foundation of this, as an argument drawn from analogy, when accurately understood, is in reality against,' instead of being in favor of the existence of this power under the present constitution. The only provision in relation to the exercise of judicial power, contained in the articles of confederation, is the following, in article nine : “ The United States, in Congress assembled, shall have the sole and exclusive right and power of apinointing courts for the trial of piracies and felonies committed on the high seas, and establishing *367, 368 courts for receiving and determining finally appeals in all cases of captures."
The judicial power here given over piracies and felonies upon the high seas, is “ sole and exclusive." So also is the power of establishing appellate courts of dernier resort for the final determi 367] nation of all cases of captures “ sole and exclusive." Some such language as this would have been used in the constitution of the United States, had it been the intention to give the federal courts exclusive jurisdiction over, or the exclusive final determination of, the various cases to which the judicial power of the United States was extended.
This provision, however, in the articles of confederation, affords no groundTor argument founded on precedent or analogy, in favor of this appellate power over the state courts. The relation of the states to the authorities under the confederation, was essentially different from that of the states to the federal government. Under the constitution of the United States, the federal government is a distinct and independent government, to which the several states stand in the relation of distinct, equal, and co-ordinate powers. But the confederation did not in reality possess the essential elements of a distinct government. The only distinct branch of government established by it was the Congress, and that was greatly dependent on the states. The confederation was a mere alliance of the states for common defense, and certain general regulations respecting their foreign relations, commercial affairs, etc. It was not a distinct government in and of itself, but a mere agency of the states, exorcising their confederated authority. No distinct judicial system was, in fact, established by the confederation; no superior and subordinate courts authorized, and no distribution of jurisdiction provided for: so that no precedent or analogy whatever is to be found here, for this supervisory control over the state courts.
It has been said that this appellate power of the Supreme Court of the United States is sustained by contemporaneous construction of the constitution. This is, however, chiefly founded on the opinion expressed in the political work entitled “ The Federalist,” consisting of a series of articles written by Messrs. Hamilton, Madi 368] son, and Jay, over the ^signature of “ Publius.” "While this work is not entitled to the weight of judicial authority, it is liable to the further objection that it was a newspaper publication, written *369 In the haste and excitement of a political contest. And although, the authors were gentlemen eminently distinguished for ability and patriotism, yet they took part with the political party, which, in .the constitutional convention, insisted on an enlargement of the powers of the federal government beyond that which was conceded by the convention in the formation of the constitution. It is a historical fact, that the convention which formed the constitution of the United States was, to a considerable extent, divided into two parties, one of which insisted on the establishment of a national government, with an absolute negative on the power of the state governments, while the other insisted on a strictly federal government, reserving and securing to the several states their freedom and sovereignty as distinct, equal, and co-ordinate governments. On the one side, it was urged that the danger to be apprehended was, that the reserved powers of the states would combine and destroy the efficiency of the delegated power; and on the other side, it was strenuously insisted that the danger to be feared was that the delegated powers of the general government would absorb the reserved powers of the states and result in a consolidated government destructive to the sovereignty of the states, and dangerous to the freedom of the people. This division of opinion was manifested in the proceedings of the convention throughout its deliberations, and produced much solicitude and excitement among the people of the several states. Those in the convention in favor of a national government were found in the minority; and although they yielded in the convention, and ably advocated the adoption of the constitution, they did not abandon their political views, but sought still *to carry them out, to some extent, by enlarging the powers [369 of the general government by a very liberal, and in some instances, a latitudinarian construction of the constitution. The authors of the “Federalist,” acting with the party, which insisted on giving the greatest strength and energy to the general government, placed that construction on the constitution, which tended most to enlarge its powers. It is true, Mr. Madison afterward somewhat changed his course, united with Mr. Jefferson and his friends, and, for a time, adopted the strict construction of the constitution, as appears from, his report and resolutions in the legislature of Virginia,'in January, 1800.
The articles in the “Federalist,” therefore, should be received with many grains of allowance on account of their partisan char *370 acter. And written in the heat of a political contest, it is not surprising that they are not, in all their parts, perfectly consistent.
It is true, that the 82d number of the articles in this work, and which was written by Mr. Hamilton, expresses the opinion that “the national and the state (judicial) systems are to be regarded at one whole and that an appeal lies, not only from the state courts, to the Supreme Court of the United States, but on the last page-of this article, he adds: “ I perceive at present no impediment to the establishment of an appeal from the state courts to the subordinate national tribunals, and many advantages attending the power of doing it may be imagined!” This opinion as expressed is not deduced from a close and satisfactory analysis, or inteipretatio’n of the language of the constitution. And if it be followed, Congress would have the power, and may, whenever that body deems it proper, make the judgments of the highest courts in the several states subject to revision and reversal in the United States district 370] court, which *is held by a single judge, or in any of the other subordinate courts of the United States. If the doctrine of this work is to be adopted in the construction of the constitution, Congress may pass a law authorizing appeals from any of the courts of a state, even from justices of the peace, to any of the federal tribunals; and the judgments of the Supreme Court, or of any of the other courts of a state, may be made subject to revision and reversal in any of the subordinate federal tribunals, oven in that of a mere commissioner under the federal judiciary, now in the exercise of judicial power, notwithstanding he is not appointed by and with the advice and consent of the senate,. If this doctrine be tenable, the constitution has provided no safeguard whatever for the independence and sovereignty of the states.
In the 81st article of the “Federalist,” Mr. Hamilton expresses the opinion, that Congress may confer jurisdiction on the state courts to try causes arising out of the federal constitution, and adds, in his own words: “ To confer upon the existing courts of the several states, the power of determining such causes, would perhaps be as much ‘to constitute tribunals’ as to create new courts with the like power f etc. How is this to be reconciled with the first section of the third article of the constitution, containing the positive provision that the judicial power of the United States shall be vested in one Supreme Court, and in such inferior courts as the Congress may from time to rime ordain and establish, the judges of which courts shall *371, 372 hold their offices during good behavior, and at stated times, receive-for their services a compensation from the United States, which shall not be diminished during their continuance in office? Are-not the judges of the inferior-courts, in whom the judicial power of the United States is authorized to be vested, federal courts exclusively? By whom are they to *be appointed? From [371 what source are they to receive their salaries ? And can their compensation be diminished during their term of office ?
As a further instance, to show the liberal construction given by Mr. Hamilton to the constitution, it may be added, that in his report as secretary of the treasury of the United States, of December 5, 1791, he expressly contends, that it belongs to the discretion of Congress to pronounce upon the objects which concern the general welfare, for which an appropriation of money may be made; and in his own words, says: “ There seems to be no room for a doubt that whatever concerns the general interests of learning, of agriculture, of manufactures,- and of commerce, are within the sphere of the national councils, as far as regard? an appropriation of money." Such a construction, once conceded, would result in a consolidation of all the controlling civil power and influence in the general government, and a total annihilation of the sovereignty and freedom of the states.
Yet on the fifth page of the 45th article in the “Federalist,” the following language is used by Mr. Madison:
“ The powers delegated by the proposed constitution to the federal government are few and defined. Those which are to remain in the state governments are numerous and indefinite. The former will be exercised principally on external objects, as war, peace, negotiation, and foreign commerce; with which last the power of taxation will,, 'for the most part, be connected. The powers reserved to the several states will extend to all the objects, which, in the ordinary course of affairs, concern the lives, liberties, and properties of the people; and the internal order, improvement, and prosperity of the state. . . . If the new constitution be examined with accuracy and candor, it will be found that the change, which it proposes, consists much less in the addition of new powers to the Union, than in the invigoration of its original powers."
Many pages might be occupied, in presenting the conflicting and irreconcilable opinions and speculations of the distinguished authors of this political publication. But *more attention has already [372 been given to it, than would have been deemed necessary, but for *373 the fact, that it has been greatly relied on as authority, on the subject under consideration, even in the reported' opinions of the Supreme Court of the United States.
In further support of this alleged contemporaneous construction of the constitution, the opinion of the first Congress which assembled, and by which the judiciary act 1789 was passed, providing for this .appellate power, is sometimes referred to. This is also an authority novel in its character. The very question involved is that of the ■constitutionality of the twenty-fifth section of the judiciary act providing for the exercise of this appellate power. And is this to be determined by th'e opinion of the legislative body which enacted the law? If this be good authority, every unconstitutional law can •sustain itself; for the law itself is an authoritative exposition of the opinion of the august body, by which it was enacted. By such authority, the constitutionality of the alien and sedition laws could be sustained, which vested arbitrary and despotic power in the president of the United States, and abridged the freedom of speech .and of the press, in plain violation of the constitution; and also, the constitutionality of the numerous other acts which have been repealed, and are now repudiated by the force of public sentiment as wholly unwarranted by the constitution.
But it is said, that, as the Congress which enacted the judiciary .act of 1789, was composed of a number of eminent men, who were prominent members of the convention which formed the constitution, the legislative construction thus given to the constitution is entitled -to great consideration. This reasoning is in conflict with the principle, which has been deemed of vital importance in all free .governments, by enlightened writers, including the authors of 373] *tho “Federalist,” that the power of making, and the power of ■expounding a law or constitution, should not be given to the same persons.
No one will deny that the illustrious men who took a leading part in forming our government are entitled to .great credit for .ability and patriotism. But it would be a manifestation of imbecility in their descendants to attribute to them the perfection of wisdom and an exemption from the ordinary infirmities of humanity. In the formation of the constitution they made an ■experiment in the science of government, new in theory, and vast and complicated in its operations. They made no pretension themselves that it was perfect, or that they could foresee all .the ■dangers or imperfections incident to its operation, and which tima *374 and experience alone could fully make known. Mr. Madison, in. the 38th article in the “ Federalist,” uses the following language : “Is it unreasonable to conjecture that the errors which maybe contained in the plan of the convention are such as have resulted rather from defect of antecedent experience on this complicated and difficult subject, than from the want of accuracy or care in the-investigation of it, and consequently that they are such as will not be ascertained until an actual trial will point them out ? This conjecture is rendered probable, not only by many considerations of a general nature, but by the particular care of the articles of confederation. It is observable that among the numerous objections and amendments suggested by the several states, when these articles were under consideration, not one is found which alludes to the-great and radical error which on trial has discovered itself!”
The justness of these remarks is fully illustrated by the practical operation of the system under the constitution, which has fully demonstrated that the opinion of those eminent men who formed the constitution (and which -^doubtless led to the adoption [374 of the 25th section of the judiciary act), that the powers of the general government would prove too weak to resist the influence-of the state governments was groundless; and that, on the contrary, the weak point in the system is fully shown to consist in the concentration of power and influence in the federal government, tending rapidly to absorb the entire sovereignty of the states.
I concede to the fullest extent that high respect and deference for-the decisions of the Supreme Court of the United States justly and properly due, from a consideration, not only of the position of that-tribunal, but also of the eminent intellectual and moral qualities which have distinguished its incumbents. But timid submission to the exercise of extraordinary civil power, without even an inquiry into the reason or authority for its assumption, is not required by the high consideration due that court. It is not to be-expected, in case of conflict between the authorities of the federal and the state governments, that the decision of the federal tribunal is to be above the reach of respectful examination, even by the-authorities of the co-ordinate power. The sentiment which would exact such submission may bo becoming under the exercise of despotic power, where an inquiry into' its reason or authority is not. allowed, but it is not suited to the temper and characteristics of a free people.
*375, 376 It is said that this appellate power of the Supreme Court of the United States has been exercised for many years and sustained by repeated adjudications. If unauthorized it is a sufficient answer to this, that the usurpation of civil power in this country never becomes constitutional or legal by prescription or frequent repetition. And although the federal court has decided in favor of its ■own assumptions of power over the state courts, its decisions have 375] not *been universally acquiesced in ; on the contrary, some ■of the states have not only absolutely refused submission, but suc■cessfully resisted its power. In the case of Hunter v. Martin, devisee of Fairfax, in which the validity of a treaty of the United States was drawn into question, the Supreme, Court of Appeals of •the State of Virginia unanimously refused obedience to a mandate from the Supreme Court of the United States, holding that the 25th section of the judiciary act was unconstitutional, that the appellate power of the Supreme Court of the United States could not be extended to the proceedings of the state courts, and that the •proceedings of the federal court in that case, purporting to reverse the judgment of the state court, were coram non judice. It appears from the report of this case, in 4 Munford, 1, that the subject was thoroughly investigated on the hearing, and an elaborate ■opinion from each member of the court is given, maintaining the position taken, by arguments remarkable for ability, and the dignified and dispassionate view taken of the whole subject.
The State of Georgia refused submission to the assumption of ■power by the Supreme Court of the United States, as early as 1792, in the case of Chisholm, Ex’r, etc. v. Georgia, reported in 2 Dallas, 419. That state declined to appear to answer to the suit in the federal court, or give the slightest countenance to the exercise of power, by the Supreme Court of the United States, over the state. In 1794, judgment was rendered for the plaintiff, and against the •state on default, and a writ of inquiry of damages awarded. The state, however, persisted in refusing submission, and the writ of inquiry was never executed; and in 1798, the judgment was •“ swept from the records of the court,” after the addition to the 376] . constitution of, the ^provision declaring the true construction ■of the second section of the third article of the constitution.
The case of Worcester v. The State of Georgia, 6 Pet. 515, was a writ of error from the Supreme Court of the United States to the •.superior court of Gwinnett county, to reverse the judgment of the *377 •state court, under which Worcester had been convicted and sentenced to the penitentiary, for the violation of the criminal provisions of a statute of Georgia, in relation to white persons residing within the Cherokee nation of Indians, without permission and •conformity to the laws of the state. The Supremo Court of the United States, in 1832, gave judgment reversing and annulling the judgment of the state court, and directing a special mandate to be sent to the state court, to carry the judgment of reversal into execution.
And in the case of Butler v. The State of Georgia, which was a case of the same kind, the Supreme Court of the United States rendered the same kind of a judgment, and made the same kind of an order as that made in the case of Worcester, 6 Pet. 597.
It appears, however, that on the receipt of the mandate in each of these cases, the authorities of the State of Georgia treated them as matters of no validity, wholly disregarded them, and not only kept Worcester and Butler in the penitentiary, in defiance of the orders of the Supreme Court of the United States, but also continued to execute the state law, under which they were convicted.
Two other cases occurred in Georgia, of even a more serious character; one, the case of Tassels, in 1830, and the other the case of Graves, in 1834. Each of these persons, having been convicted under the criminal laws of the state, and sentenced to the punishment of death, the Supreme Court of the United States, in each case, on the application *of the defendant, had allowed a [377 writ of error to the state court; but the state authorities, in each case, treated the proceedings in the federal court with contempt, and executed the sentence of the state court, by hanging the defendants. But the matter was not allowed to stop here. In reference to the case of Tassels, the legislature of the State of Georgia, in 1830, adopted, among others, the following resolutions :
“Resolved, That the State of Georgia will never so far compromit her sovereignty as an independent state, as to become a party to the case sought to be made before the Supreme Court of the United States, by the writ in question.
“Resolved, That his excellency, the governor, be, and he and every other officer of the state is hereby, requested and enjoined to disregard any and every mandate and process, that has been or shall be served on him or them, purporting to proceed from the chief justice, •or any associate justice of the Supreme Court of the United States, *378 for the purpose of arresting the execution of any of the criminal laws of this state.”
Besolutions were also passed by the legislature of that state to the same effect, in reference to the case of Graves, in 1834.
It is understood, that the States of Tirginia and Georgia have ever refused to recognize, or acquiesce in, the exercise of this power of the Supreme Court of she United States. And in the recent case of Padelford, Fay & Co. v. The City of Savannah, decided in the Supreme Court of Georgia, 14 Ga. 440, an elaborate opinion is given, exposing and condemning, in strong and severe terms, this unwarranted exercise of power by the Supreme Court of the United States.
In the case of The Commonwealth v. Cobbet, 3 Dallas, *467, the Supreme Court of the State of Pennsylvania, by a solemn adjudication, unanimously refused to submit to the control of the federal judiciary over the state courts, provided for in the judiciary act of 1789, on the ground of its unconstitutionality. And in this case, Chief Justice McKean very fully expressed the opinion of the court against the interpretation of the constitution, by which this appellate power is claimed.
In Johnson v. Gordon, 4 Cal. 338, the Supreme Court of California determined that the Supreme Court of the United States had no appellate power over the gtate courts. And in a recent case in Wisconsin, the report of which is not before me, the Supreme Court of that state denied this appellate power in the federal court, and successfully refused submission to it, as I am informed.
I am not informed of a single instance, in which the question has been fairly made in the Supreme Court of a state, where this power, claimed for the Supremo Court of the .United States, has been approved, although it has been reluctantly submitted to, in a number of instances.
It may well be claimed, therefore, that this doctrine of the Supreme Court of the United States is not of unquestionable or unquestioned authority. On the contrary, it appears that since its first assumption, although it may have been submitted to in a number of instances without the question being made, yet it has beeh always questioned in some of the states, and not only denied in their courts, but in some cases successfully resisted.
The decisions of the Supreme Court of the United States in favor of its own assumptions of power, and the enlargement of the pow- *379, 380 era of the general government, have not been satisfactory, and have greatly detracted from the weight, which would have been otherwise conceded to the opinions of that tribunal. The federal courts, at first, even ^assumed jurisdiction of crimes at common law. [379 2 Dallas, 297, 384. This jurisdiction was afterward abandoned, and is dow conceded to have been an unauthorized exorcise of power. And it is a remarkable fact, that almost every unwarranted stretch of power by Congress has been sustained by the Supreme Court of the United States. This is a matter of public history. The alien and sedition laws; the vexatious regulations of the embargo and non-intercourse acts; the act to incorporate a bank of the United States (passed in the exercise of a power, not only not found in the constitution, but which the convention which framed the constitution of the United States, by a distinct vote, positively refused to delegate) ; the recent bankrupt law (which, by its retroactive operation, invaded the rights of private property, and to an alarming extent impaired the obligations of actual contracts, made on the faith reposed in the integrity of the government, and on the terms of existing laws) ; these, and numerous other acts, which might be mentioned, now repealed, and wholly repudiated by the force of public sentiment as unwarranted by the constitution, received a ready sanction in the Supreme Court of the United States. In view of the unmistakable disposition manifested by that tribunal, to enlarge the powers of the general government by construction ; in view of that fact, that it has taken under its protection almost every species of corporations, political, pecuniary, and eleemosynary; in view of its repeated encroachments on the sovereignty of the states, by annulling laws, which in no way whatever concerned the affairs of the federal government, or interferred with the progress of its legitimate administration, it must be admitted, although much to be lamented, that the decisions of that tribunal have not only lost much of their *moral influence, but much weight as judicial [380 authority, in the courts of the states.
| In asserting this appellate power over the state courts, the Supreme Court of the United States has not deduced it from the constitution by any, clear and satisfactory interpretation. The cases in which the court has attempted to defend this power by argument are Martin v. Hunter, 1 Wheat. 304, and Cohens v. Virginia, 6 Wheat. 413. In the first, the opinion of the court is by Mr. Justice Story; in the latter, by Chief Justice Marshall. In *381 both, these opinions, the second clause of the second section of the third article of the constitution, which contains the clause providing for the appellate power of the Supreme Court, is separated from its connection with the other parts of its subject-matter, and, taken abstractly, is declared to give appellate power in general terms, without any reference whatever to the inferior courts over which it shall be exorcised. This, as I have already shown, is an unfair and unwarrantable mode of construing the constitution. Taken in its proper connection, the appellate power here given has a clear and undoubted reference and application to the inferior federal courts mentioned and authorized, as a part of the same judicial system.
Again, remarkable as it may seem in both these opinions, the first clause of this second section, which provides that “ the judicial power of the United States shall extend to all cases in law and equity arising under this constitution, the laws of the United States, and treaties,” etc., is relied on to sustain this appellate power. I have already shown that this provision clearly confers neither appellate nor exclusive jurisdiction.
In the case of Martin v. Hunter, 1 Wheat. 340, the Supreme 381] Court of the United States concedes the fact that *the language of the constitution extending the judicial power to “all •cases ” arising out of the enumerated subjects, does not confer exclusive jurisdiction touching these matters. But Mr. Justice Story says, that, as the state courts will exercise concurrent jurisdiction over many of these enumerated subjects, if no appeal can be taken from the state courts to the federal courts, the judicial power of the United States will extend only to some, and not all such cases I This is certainly an unsatisfactory mode of reasoning. If even the right •of appeal from the state courts to the federal courts existed, it would frequently happen that an appeal would not be taken from the adjudication in the state court. In such case, could it be pretended that the constitutional exercise of the judicial power of the United States was defeated? Certainly not. It may be said, however, that the failing party had the option to appeal, and bring his •ease, within the judicial power-of the^Uuited States. But if this extension of the judicial power of the United States to all cases, •etc., is anwered by leaving it to the option of one of the parties to •bring the case within the exercise of it, the option of the party instituting the suit, to bring it in the federal courts, is all-sufficient. *382 This would be extending the judicial power of the United States to all the enumerated cases, in accordance with the constitution, which •can mean nothing more than authority to exercise jurisdiction over any of the specified cases, whenever a party shall elect to institute a suit in the federal courts touching the same.
In both these opinions the federal court has manifested great sensitiveness and jealousy in regard to the concurrent jurisdiction of the state courts. The leading consideration in the strained construction given to the constitution by the federal court, appears to be founded on the supposed abuse of power by the state courts. ■It seems to *be taken for granted that the state courts are [382 not to be trusted, and will be unfaithful to the constitution of the United States, notwithstanding the judges are sworn to support it. And Judge Story, in Martin v. Hunter, 1 Wheat. 348, said, that “mischiefs truly deplorable” would exist, if the federal court did not exercise a supervisory control over the state tribunals. And in the case of Cohens v. Virginia, 6 Wheat. 264, Chief Justice Marshall said: “ It would be hazarding too much to assert, that the judicatures of the states will be exempt from the prejudices by which the legislatures and people are influenced, and will constitute perfectly impartial tribunals."
The anticipated abuse of power by the states, and the supposed disregard of the constitution and laws of the United States by the •state courts, is made the pretext for the assumption of this appellate power over the state courts. In both the opinions of the Supreme ■Court of the United States mentioned, the burden of the argument is-, that this supervisory power is reasonable, proper, and highly necessary. The necessity and utility of the power has ever been the tyrant’s plea for the usurpation of power. This argument, founded on the utility and necessity of the power, would have been legitimate in the convention which formed the constitution, or on a proposition to amend the constitution; but in giving .a construction to the constitution, it is entitled to no consideration whatever, if the power be not fairly and clearly deducible from the language of the instrument.
In both of these opinions of the Supreme Court of the United States, the “ Federalist,” is relied on as very high authority. And-here the remark is not inappropriate, that one of the leading points •decided in the case of Cohens v. Virginia, was that this appellate jurisdiction could be exercised against a state as a party defendant. *383, 384 383] On this point, ^however, the authority of the “ Federalist" is in direct conflict with the decision of the court, as appears by the following extract from the 81st article of that work:
“ It is inherent in the nature of sovereignty not to be amenable-to the suit of an individual without its consent. This is the general sense, and the general practice of mankind, and the exemption, as one of the attributes of sovereignty, is now enjoyed by the government of every state in the Union. Unless, therefore, there is a. surrender of this immunity in the plan of the convention, it will remain with the states, and the danger intimated must be merely ideal. . . . The contracts between a nation and individuals are only binding on the conscience of the sovereign, and have no pretension to a compulsive force. They confer no right of action independent of the sovereign will. To what purpose would it bo, to authorize suits against the states for the debts they owe ? How could recoveries be enforced? It is evident it could not be done, without waging war against the contracting state, and to ascribe to the federal courts, by mere implication, and in derogation of a preexisting right of the state governments, a power which would involve such a consequence, would be altogether forced and unwarrantable.”
Although the “ Federalist ” is cited as reliable authority to sustain the appellate power of the Supreme Court of the United States over the state courts, yet the opinion expressed in this work, that a state is not amenable to a suit brought against it in the federal courts, is wholly repudiated. And as early as the case of Chisholm v. Georgia, 2 Dallas, 474, the Supreme Court of the United States held that the judicial power of the United States extended to a suit against' a state, since which it has been no rare occurrence for a state tó be arraigned before the bar of the Supreme Court of the United States. And inasmuch as Judge Story, in a note in his-Commentaries on the Constitution, volume 3, page 548, not only repudiates the doctrine of Mr. Hamilton, above recited from the 81st article of the “Federalist,” as irreconcilable with the reasoning of the next.preceding article of the same work ; but also, on page 546 of his Commentaries, copies extensively from this preceding arti384] cle in the “ Federalist,” to sustain the opposite ^opinion, I will take the liberty of sustaining the doctrine of the “Federalist” in article 81, above recited, by an authority entitled to very great respect. In the convention of Virginia, on the occasion of the ratification of the constitution of the United States, John Marshall,, (afterward chief justice), in a speech in the convention, said:
*385 “ I hope no gentleman will think that a state will be called at the bar of the federal court. .Is there no such case at present? Are there not many cases in which the legislature of Virginia is a party, and yet the state is not sued? It is not rational to suppose that the sovereign power shall be dragged before a court. The intern t is to enable states to recover claims of individuals residing in •other states. I contend this construction is warranted by the words. But, say they, there will be partiality in it if a state can not be defendant, if an individual can not proceed to obtain judgment against a state, though he may be sued by a state. It is necessary to beso, .and can not be avoided.” 2 Elliott’s Debates, 405.
It would appear, therefore, that-the “ Federalist ” is not only not .-always consistent with itself, but not always consistent with the doctrine of the Supreme Court of the United States; that Chief Justice Marshall announced a doctrine from .the bench, the very ■opposite of that which he had previously declared in the convention of Virginia, when urging the adoption of the constitution; and that Mr. Justice Story, while he adopted the doctrine of ono,article .in the 11 Federalist ” as high authority, repudiated that of the next ■succeeding article as irreconcilable with the part of the work which he had adopted! The opinions of these great, and no doubt good men, entangled with plain inconsistencies and confounded by conflict, constitute the chief weight of authority to sustain the supervisory -power of the Supreme Court of the United States over the -state courts. It is true that the Commentaries of Chancellor Kent, and also the works of some other highly respectable elementary writers, are sometimes referred to as sustaining this appellate power. But it is to be remarked *that none of these writers [385 have entered into any investigation of the subject themselves. They simply give the opinion declared by the Supreme Court of ■the United States, and that found in the “Federalist,” on which the whole doctrine appears to rest.
The admitted fact that the Supreme Court of the United States can not control the action of the state courts by supersedeas, pro•cedendo, or mandamus, furnishes a most conclusive argument ■against the right to the appellate jurisdiction in question. Such power of control over subordinate courts is essential to the complete -and proper exercise of the appellate power.
The twenty-fifth section of the judiciary act of 1789 provides -only for its-exercise in cases where the record of the state court ■discloses the fact that questions arose connected with some of the *386 enumerated subjects of the federal jurisdiction. And the Supreme Court of the United States have, in numerous cases, adjudged that, it was essential to the. exorcise of this appellate power over the state courts that the record of the-state court should explicitly show the following- indispensable requisites, to wit: 1. That a question arose in the state court involving some of the specified subjects of the judicial power of the United States; 2. That a decision was actually made on the question in the state court in the way pointed out in act of Congress; 3. That the decision became necessary in the determination of the case. And if each one of these requisites do not appear by the record, it is held .that the jurisdiction fails. Crowell v. Randall, 10 Pet. 368; Commercial Bank of Cincinnati v. Buckingham’s Ex’rs, 5 How. 341.
Now, it is unquestionable that the state' courts have ample, and complete control over the records of their own proceedings; and 386] may, in most cases, successfully defeat *this appellate power by causing their records to be so made up as not to show that any such questions arose or were decided. And it is undeniable that each state has the power oven to prohibit the allowance of a copy of the record of any of its judicial proceeedings for-'the exercise-of this appellate jurisdiction by the federal courts. And the Supreme Court of the United States being clothed with no power, by mandamus or otherwise, either to control the form of the record in the state court, or to compel the furnishing of an exemplification, this, appellate power must be wholly dependent on the discretion of the state and the action of the state court. The exercise of such appellate power, dependent in a great measure on the option of the subordinate court and wholly on the acquiescence of the state government; and to which, although some of the states will submit, yet to which other states will absolutely refuse submission, will lead to-more conflict, difficulty, uncertainty, and disturbance of harmony in the administration of justice than can be countervailed by any supposed benefit which can ever arise from it.
To sustain the supervising control of the federal courts over the state courts, it is asserted that the government of the United States is a national instead of a federal government; and that the judicial powers of the general and the state governments are blended together as parts of the same judicial system. Mr. Hamilton, in the 82d article of the “Federalist,” said: “Agreeably to the remark already made, the national and the state systems are to be regarded as *387, 388 one whole. Tho courts of the latter will, of course, be natural auxiliaries to the execution of the laws of the Union, and an appeal from them will as naturally lie to that tribunal which is destined to unite and assimilate the principles of natural justice and the rules of national decision!” The ground of the appeal, insisted upon here, is *not any express provision in the constitution, but that the [387 government of the United States is national in its character, the state courts mere auxiliaries of the courts of the United States, and the-national and the state judicial systems to be regarded as parts of one and the same system, or, in the language of Mr. Hamilton, “ as one whole.” This doctrine is not merely quoted by Chief Justice-Marshall, in the case of Cohens v. Virginia, with marked approbation, but adopted as the true exjDOsition of the theory and basis of our government. And in the case of Martin v. Hunter’s Lessee, 1 Wheat. 323, Mr. Justice Story not only adopted the same doctrine,, but enlarging and amplifying on it, said: “ The constitution of the United States was ordained and established, not by the states in their sovereign capacities, but emphatically, as the preamble of the constitution declares, by the people of the United States.’ There can be no doubt that it was competent to the People to ihvest the general government with all the powers which they might deem proper and necessary, to extend or restrain these powers according to their own good pleasure, and to give them a paramount and supremo authority.”
This is the only ground which gives plausibility even to the claim of a supervising power in the Supreme Court of the United States over the state courts. If the government of the United States be a national government, and the states subordinate departments; if the judiciary of the United States and that of the several states are blended, belong to one and the same system, are but parts of “ one-whole,” deriving their powers from the same source, and responsible to the same authority, then it may be admitted that there is force in the argument in favor of this appellate power; but if, on the other hand, the government of the United States be a federal government of limited and defined powers, and the states distinct, independent sovereignties, *witbin tho appropriate sphere of their [388 powers; if the judiciary of the United States and that of the several states are separate and distinct from each other, belonging to independent and distinct judicial systems, each distinct and different in its organization from the other, deriving its power from a different *389 source, and responsible to a different authority, then this appellate power claimed for the Supreme Court of the United States is wholly inconsistent with the theory and structure of our government.
This distinction is a most important one in the determination of the question under consideration. As has already been remarked, appellate jurisdiction comprehends the relation of superior and subordinate tribunals; and if this appellate power over the state courts be delegated by the constitution, Congress has the authority to provide all the necessary and proper remedies to carry it into full and complete execution. Eor the full exercise of the powers of an appellate court, there must be not only the power of reversing the judgment of the subordinate court, but the necessary control over its action. The appellate court must have the power by supersedeas to suspend the action of the subordinate tribunal, pending an appeal or writ of error; the power by mandate to require its judgments of reversal to be entered in the subordinate court; and the power by procedendo to compel the subordinate court to proceed in the exercise of its authority, under the direction of the revising power. And the very fact of the relation of superior and subordinate tribunals in the exercise of the same judicial power, furnishes just foundation for giving the superior court the further controlling power of the writ of mandamus, and also the writ of prohibition. And if Congress can give the Supreme Court of the United States supervising power over the state courts, it can confer the same power on 389] the circuit, the district, and other ^inferior federal courts. The one is derived from a construction which most indubitably sustains the other. The constitution, although it prescribes the line of distinction between the original and appellate jurisdiction of the Supreme Court, leaves the distribution of the jurisdiction of the inferior federal courts to the discretion of Congress. And if the relations of the general and the state governments be such, that a supervising power can be given by Congress over the courts of the latter to the Supreme Court of the United States, it follows, that by the exercise of the same power, it can be given to the inferior federal tribunals in regulating their appellate jurisdiction. So that, if Mr. Hamilton’s proposition in relation to the appellate power of the Supreme Court be correct, his opinion above referred to in the “ Federalist,” in relation to the appellate power which might be given to the inferior federal courts over the state courts, follows as a legitimate deduction. And in the case of Martin v. Hunter, above cited, *390 in 1 Wheaton, on page 349, Mr. Justice Story, in defending the provision of the 12th section of the United States judiciary act of 1789, for the removal of a suit before trial from tho state courts to the circuit court of the United States, distinctly said, that this is the exercise of appellate and not of original jurisdiction. And on page 350, he adds: “And if the appellate power by the constitution does not include cases pending in the state courts, the right of removal, which is but a mode of exercising that power, can not be applied to them.” The same doctrine is adopted and repeated by the learned jurist, in the third volume of his Commentaries" on the Constitution, pages 609 and 610. This proceeding of'the federal judiciary gives a new feature to appellate jurisdiction, heretofore understood as importing the power of re-trying or revising the proceedings or decisions of a subordinate court, in which judicial action had actually taken place. *Under this provision of the judiciary act, the cause is rc- [390 quired to be transferred to the federal court, before there has been any decision, or any action whatever, taken by the state court. And this, Mr. Justice Story called appellate jurisdiction, and said, that the right of removal can not be exercised unless it be by appellate jurisdiction. Yet the learned commentator, in tho third volume of his Commentaries on the Constitution, on page 627, said:
“ In reference to judicial tribunals, an appellate jurisdiction, therefore, necessarily implies that tho subject-matter has been already instituted in, and acted upon by some other court, whose judgment or proceedings are to be revised. This appellate jurisdiction may be exercised in a variety of forms, and indeed in any form which the legislature may choose to prescribe; but «still, tho substance must exist, before the form can be applied to it. To operate at all, then, under the constitution of the United States, it is not sufficient that there has been a decision by some officer, or department of tho United States: it must be by one clothed with judicial authority, and acting in a judicial capacity.”
This doctrine, in relation to the foundation for the exercise of appellate jurisdiction, will be universally recognized as correct, and how it is to be reconciled with the proceeding under the 12th section of the judiciary act, for the .removal of a cause from a state coui’t, after its jurisdiction has legally and constitutionally attached, but before any judicial action has been taken in the case, is left for others to say, presuming it to be one of tho instances, in which extraordinary power requires extraordinary reasons to sustain it. .
*391, 392 It appears, therefore, according to the doctrine of Mr. Justice Story, that the appellate jurisdiction of the subordinate federal courts over the state courts has been already, in one form, actually provided for. If the federal courts can exercise a revising power over the state courts, in cases where the jurisdiction of the state tribunals is fully ad-891] mitted, it must result from the subordination of the state ^courts to the federal tribunals, and because the government of the United States, and that of the several states, are not equal and co-ordinate governments, but because the government of the United States is national in its form, and the states but subordinate parts of one consolidated system.
Appellate jurisdiction is not only a continuation of the exercise of the same judicial power which has been executed in the court of original jurisdiction, but it necessarily implies that the original and appellate courts are capable of participating in the exercise of the same judicial power. After the exercise of the appellate power in the adjudication of a cause, important judicial acts often remain to, be done in the court of original jurisdiction. The entry of the judgment in the subordinate court is essential; otherwise the judgment on the records of that court appearing in full force, would entitle the party to the process of the court to enforce it; and in such case, if process be issued on the judgment in the appellate court, a conflict would arise between the ministerial officers of the two' courts, each protected by judicial process. But further, the subdorinate court has more to do than simply enter the judgment of the appellate court; it must conform its action to it, and carry it into full effect. It is frequently necessary, in the proper exercise of the revising power, that the appellate court simply settle some general principles or preliminary questions which govern a case, and remand it to the subordinate court with a procedendo, thus directing and controlling the action of the court of original jurisdiction in the further investigation and adjudication of the case. In the case before us, suppose that we should allow this motion, and the Supreme Court of the United States should reverse our judgment, the mandate of that court to us would require us to enter upon our 892] records a judgment not our town, but a judgment pronounced by that court, contrary to our own judgment in the case, and which we would be commanded to carry into effect. If we should comply with the mandate by entering the judgment of reversal, and conforming our action to it, and carry it into full effect, *393 we would perform either a ministerial or a judicial act. It would scarcely be pretended by any to be the former. There is certainly no authority for the federal court to require the performance of ministerial or executive duties by this court. Ministerial or executive duties under a department of the general government are performed by ministerial or executive officers, appointed and acting under the authority of the constitution and laws of the United States. As it could not be a ministerial, it must be a judicial act which we would be directed to perform. Every judicial act necessarily requires the exercise of judicial power. In the performance of this act, would we exercise the judicial power of the United States, or the judicial power of the State of Ohio? It could not be the judicial power of the state. That has been fully and finally exercised in the case by the judgment which we have already rendered. A final judgment in this court expends or exhausts its judicial power as to that case; and unless brought up again upon some motion or proceeding known to the laws of the state, or some-action by the Supreme Court of the state, the judicial power of the state must there finally terminate. And it will hot be pretended that there is anything in the constitution or laws of Ohio requiring' of us, either the performance of any such act, or even the one now asked by the motion before us. If either could be legally done at all, it would have to be done in the exercise of the judicial power-of the United States. But how are we to be enabled the exercise the judicial power of the United States when, by the express provision of the constitution, all the judicial *power of the United [393-States is vested in one Supreme Court, and such inferior courts as Congress shall ordain and establish; the judges of which shall hold their offices during good behavior, and receive a fixed compensation from tb.e general government.
It is claimed, however, that the government of the United States-is a national government, of which the states are mere subordinate departments, so that the judicial power of the several states and that of the United States are blended, and must be regarded- as one and the same, and, consequently, that the courts of each may be enabled to exercise authority by virtue of the judicial power of the other. This involves an inquiry into the true theory and nature of our system of government, in regard to a matter not depending-on mere speculation, but a true exposition of which is to be found. *394 by reference to the constitution itself, and the public records and history of its formation.
A national government is the government of the people of a single state or nation, united as a community by what is termed the social compact, and possessing complete and perfect supremacy over persons and things, so far as they can be made the lawful objects of civil government. A. federal government is distinguished from a national government by its being the government of a community of independent and sovereign states, united by compact. The thirty-ninth number of the “ Federalist ” furnishes the following distinction between a national and federal government:
“The idea of a national government involves in it not only an authority over the individual citizens, but an indefinite supremacy over all persons and things, so far as they are objects of lawful government. Among a people consolidated into one nation, this supremacy is completely vested in the national legislature. Among -communities united for particular purposes, it is vested partly in the general and partly in the municipal legislatures. In the former 394] *case, all local authorities are subordinate to the supreme, and may be controlled, directed, or abolished by it at pleasure. In the latter, the local or municipal authorities form distinct and independent portions of the supremacy, no more subject within their respective spheres to the general authority than the general authority is subject to them within its own sphere. In this relation, then, the proposed government can not be deemed a national one, since its jurisdiction extends t'o certain enumerated objects only, and leaves to the several states a residuary and inviolable sovereignty over all •other objects.”
Originally each state of the American Union was, in the language •of the declaration of independence, “ free and independent,” possessing all'the powers and supremacy of a separate and distinct nation of people. The constitution of the United States originated from the confederation of the states under the articles of confederation of 1778, the first and second articles of which were as follows:
“Art. 1. The style of this confederacy shall be 1 The United States of America.'
“Art. 2. Each state retains its sovereignty, freedom, and independence, and every power, jurisdiction, and right, which is not, by this confederation, expressly delegated to the United States in Con.gress assembled.”
*395 It is not pretended by any that this confederacy possessed the elements of a national government, but it is admitted to have been, a simple compact between independent states for mutual defense, and some other general purposes. It is claimed by some, however, that, by the constitution of the United States, the sovereignty of the people of each state was surrendered and transferred to the people of all the states, in the aggregate, and that thus the people' of all the states of the Union became consolidated into one single community or nation. The history of the formation of the constitution exposes the utter fallacy of such an idea. ■ The convention which framed the constitution was called, not by the act or authority of the people of the several states in mass, but by a resolution of the Congress, the organ of the several states under the confederacy. And it was called, not *for the purpose of establishing a [395 national government, but on the contrary, in the language of the resolution of the Congress of the confederacy calling the convention, “for the sole and express purpose of revising the articles of confederation, and reporting to Congress and the several state legislatures, such alterations and provisions therein, as shall render the federal constitution adequate to the exigencies of the government and the preservation of the Union.”
The object of the convention is here most explicitly defined. It was not to establish a national government for the people of all the states, and thereby abolish the state sovereignties, but solely and expressly to revise the articles of confederation between the several states, etc. With this distinctly-defined object in view, the delegates to that convention were appointed, not by the authority of the people of the states in the aggregate, but by the legislatures of the several states. And the commissions from the several states' to their delegates in this convention expressly limited their authority to this definite object, for which the convention was convened. In the convention which framed the constitution, the delegates voted hy states, and after its formation it was submitted to the several states and ratified, not by the whole people of the United States, but by each state acting separately and for itself, as an independent sovereignty.
The formation and ratification of the constitution, therefore, was not the act of the people of.the states collectively, but the act of the people of each state acting separately and independently for themselves. And the distinctly-defined object with which it was done *396 was not the establishment of a consolidated national government for the people of the whole United States, as one community or nation, but the simple revision of the articles of confederation, and 396] *the establishment of a government based on the federal ■compact. This is fully sustained by the views --of Mr. Madison, expressed in the number of the “ Federalist” last above quoted, in which he said:
“ This assent and ratification is to be given by the people, not as individuals composing one entire nation, but as composing the distinct and independent states to which they respectively belong. It is to be the assent and ratification of the several states, derived from the supreme authority in each state, the authority of the people themselves. The act, therefore, establishing the constitution will not be a national but a federal act.”
And the author continues :
“ That it will be a- federal and not a national act, as these terms are understood by the objectors, the act of the people as forming .so many independent states, not as forming one aggregate nation, is obvious from this single consideration, that it is to result neither from the decision of a majority of the people of the Union, nor that of a majority of the states. It must result from the unanimous assent of the several states that are parties to it, differing no otherwise from their ordinary assent than in its being expressed, not by the legislative' authority, but by that of' the people themselves. Were the people regarded in this transaction as forming one nation, the will of the majority of the whole people of the United States would bind the minority in the same manner as the majority in each state must bind the minority, and the will of the majority must bo determined either by a comparison of the individual votes, or by considering the will of the majority of the states as evidence ■of the will of -the majority of the people of the United States. Neither of these rules has been adopted. Each state, in ratifying the constitution, is considered as a sovereign body, independent of all others, and only to be bound by its own voluntary act. In this relation, then, the new constitution will, if established, be a federal .and not a national constitution.”
Those who insist on the appellate power of the Supreme Court ■of the United States in question, can not consistently repudiate the authority of the “Federalist.”
The preamble to the constitution has been appealed to, in support of the doctrine that the constitution of the United States was *397, 398 •ordained and established by and for the people of the states collectively, as a distinct community or nation. This argument is founded upon a mere *literal interpretation of the preamble, [397 wholly disregarding the true authority by which the constitution was established, the source from which its powers wore derived, and the true nature and objects of the powers delegated. The preamble reads : 11 We,the people of the United States, in order to form a ■moreperfect union, etc., do ordain and establish this constitution of the United States of America.” What is here meant by the expression, “we, the people of the United States?” It expresses the authority by which the thing was done. It moans the people by whoso authority the constitution was formed and ratified. It was the act of forming and ratifying the constitution, which ordained and established it. It was formed by delegates appointed by the representatives of the people of the several states in their respective state legislatures; and it was ratified by the several states, through a convention of •delegates in each state, elected by the people of the state, each state, in doing the same, acting for itself and by the authority of its people, as a separate and independent nation. The constitution, therefore, was ordained and established, not by the whole people of the United States collectively, or in mass, as a distinct community, but by the several states, the people of each acting in the name and by the authority of their state, as a distinct, independent, sovereign people. It is, therefore, incontestable, that the words of the preamble, “we, the people of the United States,” mean the people of the several states of the Union, not collectively and in mass, but as the people of distinct, independent states, acting by their respective separate state authorities, in forming a compact with each other, and establishing a federal government, or government, the parties to which were distinct communities, or independent states, as contra-distinguished from the people of all the states taken collectively, or in mass. At the time of the formation of the constitution, the ^states were members of the confederacy united under the style [398 of “ the United States of America,” and upon the express condition that “ each state retains its sovereignty, freedom, and independence And the consideration that, under the confederation, “ we, the people of the United States of America,” indubitably signified the people of the several states of the Union, as free, independent, and sovereign states, coupled with the fact that the constitution was a continuation of the same Union, and a mere revision or remodeling of *399 the confederation, is absolutely conclusive, that, by the term, “the Ignited States,” is meant the several states united as independent and sovereign communities; and by the words, “ we, the people of the United. States,” is meant the people of the several states as distinct and sovereign communities, and not the people of the whole United States collectively as a nation.
The preamble declares that the constitution was ordained and established “for the United States of Ameica.” And as “the United States ” means the several states united by compact under a federal government of limited and expressly defined powers, it follows that the constitution was ordained and established for the people of the several states as distinct communities, by whom it was ordained and established. The omission to enumerate the states by name, by which and for which the constitution was ordained and established, makes nothing against this interpretation. It appears from the proceedings in the convention which formed the constitution, that the first draft of the constitution contained an enumeration of the states by name, after the word “ people ;” but after the adoption of the seventh and last article, providing that “the ratification of the conventions of nine states should be sufficient for the establishment of this constitution between the states so ratifying the 399] same,” it became necessary to strike out the ^enumeration of the states by name, which was accordingly done. See 1 Madison’s Debates, 1539.
The objects, for which the constitution was ordained and established, are explicitly defined in the preamble. Had the object been to abolish the states as independent and sovereign communities, and establish a national government for the American people collectively, as constituting, one consolidated distinct community, it would have effected a change far greater than that which was effected by the American revolution ; and that purpose would have been manifested by provisions leaving no ground for cavil or doubt. But the objects of the constitution declared in the preamble, differ very little from the purposes of the confederation as declared in the third number of the articles of confederation. The objects announced in the constitution are, to form a more perfect union, establish justice, insure domestic tranquility, provide for the common defense, promote the general welfare, and secure the blessings of liberty to ourselves and our posterity. These' purposes are very far from indicating an intention to establish a consolidated national government. The first *400 purpose named is that of forming a more perfect union, thus recognising the existing union between the several states under the confederation, and simply proposing to render it more perfect. What union is here contemplated? The question admits of but one-answer. The union between the independent and sovereign states already existing. The federal character of the government is here explicitly declared as distinguished from a consolidated national government of the American people. And when we consider the constitution as ordained and established by the people of the several states, for themselves, as distinct and sovereign communities, the objects announced in the preamble are plain and easy of comprehension. They were to perfect their union as distinct and ^sovereign [400 communities; to establish justice among them; to insure their domestic tranquility ; to provide for their common defense and general welfare; and to secure the blessings of liberty to them and their posterity, as the people of several distinct communities. And the provisions in the body of the constitution, in every article, when.' correctly construed, fully confirm the views here expressed. 1 Calhoun’s Works, 130, 137.
According to the doctrine of the “ Federalist,” however, in one part of the work, the government of the United States is partly federal and partly national in its operation, and in the source from which its powers are derived. This position, however, will not bear the test of examination. The constitution is admitted to be federal, and not national by the same work, as has been already shown. And inasmuch as the government derives all its powers-from the constitution, and is organized on the basis of it, and indeed constituted by it, how the government can be national in any part, or in any sense, is not easy of comprehension. According to the-theory of our institutions,. sovereignty abides in the people, and government is constituted by a delegation of civil power in trust for the purposes prescribed. If the general government is to any extent, or in any sense, a national government, it must be to that extent, or in that sense, the government of the whole people of the several states collectively, or as one consolidated community; and this could not have been brought about, without the people of the . several states surrendering their sovereignty, and transferring it, 'not to the government, but to the whole people of the states col-i lectively. It has been said, that sovereignty is a thing which, from its nature; is not susceptible of division-■that the sovereign *401, 402 power may delegate authority and prescribe limits for its exercise ; but can not surrender a portion of its sovereignty, without ceasing 401] *to be the repository of the sovereignty of a state or nation. Without stopping to inquire into the correctness of this position, it Ss sufficient to say, that there is no provision in the constitution of the United States, or act in its formation and adoption, which •amounts to anything like a surrender of sovereignty by the people of the several states, and a transfer of it to the whole people of the states collectively, as a distinct community, or consolidated nation of people.
The particulars in which the “ Federalist” claims the government to be partly national and partly federal, are the following: First, in regard to the house of representatives in Congress; Second, in regard to the executive department; and lastly, in regard to the power ■of amendment. As to the first, it is said, in No. 39 of the work, thatthe house of representatives will derive its powers from the people of America, and the people will be represented in the same proportion, and on the same principle, as they are in the legislature of a particular state;” and that so far the government is national, ■and not federal, etc. The fallacy of this doctrine is most glaring. All the powers of the government, including those of the house of representatives, are derived from the constitution; and the powers of the constitution are delegated not by the American people in the aggregate, as a distinct community or nation, but by the people of the several states, as separate, independent, and sovereign states. And consistently with the constitution, it is not competent to elect the members of the house of representatives by the American people collectively, as a distinct community. On the contrary, by the express provisions of the constitution, they are required to bo elected by the people of the several states, not as composing mere districts 402] of one great community, but as distinct and ^independent states. The first bill which passed Congress apportioning the members of the house of representatives among the several states, was vetoed by President Washington, exj)ressly on the ground that it assumed as its basis that the people of the several states composed mere election districts of one great community, instead of being, as in truth they are under the constitution, distinct and independent parties to the compact upon which the government is founded. By the terms of the constitution, the representatives are apportioned among the several states in a mode expressly prescribed, and they *403 are required to be elected by the people of the several states as in'dependent communities. They may be elected by the people of any •state, either by general ticket or by districts; so that the members of the house of representatives, be the mode of election what it may, .are elected as the delegates of the several states, in their distinct, 'independent, and sovereign character as members of the Union. "Neither is it true that the people of each state are represented in ■the house of representatives on the same principle, and in the same proportion, as they are in the legislature of each state. On the contrary, it is an incontestable fact that they are represented in their respective state legislatures as mere individuals, and by election districts entirely under the control of each state, and by a ratio or proportion fixed by each state for itself, and different in different .states.
As to the executive department, the argument is equally groundless. The president of the United Slates is elected not by the "whole people of the United States in the aggregate, as a distinct community •or people, but by electors appointed by each state separately and for itself, “in such manner as the legislature thereof may direct;” and the electors are expressly required to meet and vote in their re■spective ^states. And in case of a failure of an election -by [403 •the electoral college, when the election devolves on the house of representatives, the votes are required to be taken by states, the representation from each state having one vote, etc.
And as to the mode prescribed for the exercise of the amending power, it is plainly and expressly derived from, and exercised under, the authority of the people of the several states, acting in their original, distinct, and sovereign character, and not under the authority of the whole people of the states regarded in the aggregate, as a distinct nation. And the modification of the original creating power requiring the consent of each state to make it a party to the constitution, which provides for the amendment of the constitution by three-fourths of the states, voting as states, without regard to population, certainly gives no national character to the government, neither is it inconsistent with the federal character of the Union, inasmuch as it is provided for by express agreement in the compact.
On the whole, it may be said, without the slightest ground for contradiction, that in the formation of the government of the United .States, the whole people of the states collectively as a distinct community or nation, were wholly unknown, and in no respect whatever *404, 405 the source of power; and also, that in no operation whatever of the general government, is the action of the people of the states in-the aggregate as a nation, known or recognized in any manner or form whatever. Indeed, the people of the several states of the American Union never have, at any stage of their existence, been consolidated into a single community, so as to constitute one distinct people or nation; and as such, of course, never could have ex-404] ercised any agency or participation, *either in the formation, or in the administration of this system of government.
From what has been said, it must be apparent, that the government of the United States was ordained and established by the people of the several states as distinct, independent, and sovereign communities; and that while the governments of the several states derive their respective powers from the people as individuals united under the social compact in their respective states, the government of the United States derives its powers from the states as organized communities, united by federal compact. Each state government is a government of a community of people, while that of the United States is a government of a community of states. A state government and the United States government are operative in. each state; and each has its distinct, independent sphere of action. The main objects of the authority of the general government, are the relations of the states with each other, and with foreign nations, and the common defense and welfare of the federal Union; leaving the internal affairs and domestic interests of the people of each state to the authority of the state government. The delegated powers appertaining to government are divided between these two governments, and each is divested of what the other possesses; each acting for itself, and by its own separate authority, the powers of each being entirely distinct and independent of the other, it follows of necessity, that the two governments are equal and co-ordinate governments in each state of the Union; each paramount and supreme within the sphere of its powers. The confederation which preceded the constitution of the United States, was subordinate-to the state governments, upon which, to a great extent, it was dependent. To remedy the deficiencies of the confederation, 405] *tbe powers delegated by the constitution were made independent of the states. So that the government of the Union and that of the several states, having each distinct and indejDondcnt powers, and, each distinct and independent spheres of action, be *406 ■came equal and co-ordinate governments. It follows, as a necessary •consequence, that each of the two governments being independent of the other, each must be supreme within the sphere of its operations, and neither can be subordinate to the other. So that the judicial, as well as the legislative and executive powers of each, must of necessity be not only entirely distinct and separate, but also independent of each other.
This view of the subject, so far as the separate, independent, and •co-ordinate judicial power of the two governments is involved, is fully sustained by judicial decisions in -both the state and in the federal courts. In the case of Martin v. Hunter, 1 Wheat. 304, the Supreme Court of the United States declare the doctrine, that Congress can not vest any portion of the judicial power of the United 'States in any courts, except those which are ordained and established under the Constitution of the United States. It is universally admitted, that while Congress can impose no jurisdiction on the state courts, it is equally incompetent for a state legislature to impose jurisdiction on the federal courts.
It is contended further, that the Supreme Court of the United States is the tribunal of last resort, clothed with authority to decide ■all questions touching the extent of its own powers, and also all ■controversies involving a conflict between the authorities of the federal and the several state governments, and that the appellate jurisdiction of the Supreme Court of the United States over the -state courts, is necessarily incidental to and results from this power. That the Supreme Court of the United States is the court *of [406 ■last resort to determine all eases which may be instituted under the jurisdiction of the federal courts, is not controverted; but that ■that tribunal has not only absolute authority to determine the extent of' its own ¡towers, but is constituted an umpire to determine .all questions of conflict arising between the several states and the federal government, is denied, and will be contested so long as the people of this country are capable of preserving their government in its original character. This arbitrary power once conceded, would enable the- Supreme Court of the United States to nullify •state laws, and even provisions in the state constitutions, whenever, in the opinion of that tribunal, there existed any inconsistency between them and any express or constructive authority, ■under the operation of the constitution, laws, or treaties of the United States. It would annihilate the balance of.power between *407 equal and co-ordinate governments, and destroy that check upon-the exercise of discretionary power, designed as the great safeguard against usurpation.
It is not claimed, I believe, that this high power is derived from any specific provision of the constitution ; but it is claimed to be a right incident to the supremacy of' all government, to decide as to the extent of its own powers, and to use all the necessary moans to-enforce its own authority. However this may be applicable as an incident to a single government, vested with all the powers appertaining to government, it is cleai’ly inapplicable to a system where the powers are divided between distinct and co-ordinate governments, as is the case here. The very fact that these two distinct governments in one system, are co-ordinate, necessarily implies that, they are equal, and excludes the idea of superior and subordinate. If either has the exclusive right to judge of the extent of its own powers, and also of that of its co-ordinate, and enforce its decision 407] against the ^authority of the other by physical power, not only would equality between them be destroyed, but the one would be raised from an equal to a superior, and the other be reduced from an equal to a subordinate. And the subordinate, thus stripped of the incident appertaining to all government, to judge of the extent, of its own powers with a view to their protection, would necessarily sink to the condition of a dependent. Where there is a division of power between co-ordinate departments of the same government, each designed as a check upon the other, each must be allowed to judge of the extent of its powers, and to maintain its decision against the other. Without this, there can be no division of power. To vest power in two departments, and give one of them the exclusive right to judge of the extent not only of its own powers, and how much was allotted to the other, would be no division of power at all. The one would, in effect, hold under the other. But where two governments are distinct, independent, and co-ordinate, each must possess all the necessary incidental powers-appertaining to government, within the sphere of its powers, and consequently both must possess the right to judge of the extent of their respective powers, with reference to each other. And no reason can be assigned, why one should be allowed the exclusive right to judge as to the extent of its own powers, and enforce its decision, more than the other. It is, therefore, one of the necessary incidents to the nature of distinct, independent, and co-ordi *408 nate governments under the same system, that each operate as a mutual check upon the other. And in case of conflict of authority, resort is not to be had to force; for neither has the right to force its own decision upon the other. But the appeal is to the people, the sovereign and original source of power, which acts through the ballot-box upon the legislation of the country, both state *and [468 -federal, and when found necessary, can alter the constitution by amendment.
But it is insisted, that as the constitution, laws, and treaties of the United States are declared to be the supreme law of the land, and as the general government is supreme within its own sphere, this supremacy necessarily requires, all questions of conflict between its powers, and those of any of the states to be determined by the authority of the federal government. But as the constitution and laws of the several states are equally supreme to the extent of their operation, and each state government equal and coordinate with that of the United States, the inference mentioned is-wholly unwarranted. That there is no repugnancy or incompatibility in the supremacy of each of these co-ordinate powers, and that the supremacy of the general government does not destroy the-independence of the state sovereignties, was explained' by Mr. Hamilton, in the convention of New York, on the occasion of the ratification of the constitution of the United States, in the following language, lucid, forcible, and conclusive:
“With regard to the jurisdiction of the government, so I shall certainly admit that the constitution ought to be so formed, as not to prevent the states from providing for their own existence; and I maintain that it is so formed, and that their power of providing for themselves is sufficiently established. This is conceded by one gentleman, and in the next breath, the concession'is retracted. He says, Congress have but one exclusive right in taxation, that of duties on imports; certainly, then, their other powers are concurrent. But to take off the force of this obvious conclusion, he immediately says that the laws of the United States are supreme, and that where there is one supreme, there can not be concurrent authority ; and further, that where the laws of the Union are supreme, those of the states must be subordinate, because there can not be two supremes. This is curious sophistry. That two supremo powers can not act together is false. They are inconsistent only when they are aimed at - each other, or at one indivisible object. The laws of the United States are supreme, as to all their proper constitutional objects; the laws of the states are supreme in the *409 same way. These supreme laws may act on different objects with-409] out clashing; or they *may operate bn different parts of the same common object with perfect harmony. Suppose both governments should lay a tax of a penny on a certain article, has not each an independent and uncontrollable power to collect its own tax? The meaning of the maxim, there can not be two supremes, is simply this, two powers can not be supreme over each other.” 1 Elliott’s Debates, 315.
Again, Mr. Hamilton, on this subject, in the thirty-third number of the “ Federalist,” used the following language:
“ But it is said that the laws of the Union are to be the supreme laws of the land. What inference can be drawn from this, or what would they amount to if they were not supreme ? It is evident they would amount to nothing. A laio by every meaning of the term includes a supremacy. It is a rule which those to whom it is prescribed are bound to observe. This results from every political association. If individuals enter into a state of society, the laws of that society must be the supreme regulator of their conduct. If a number of political societies enter into a larger political society, the laws which the latter may enact, pursuant to the powers intrusted 'to it by its constitution, must necessarily be supreme over those societies and the individuals of whom they are composed. It would otherwise be a mere treaty, dependent on the good faith of the parties, and not a government, which is only another word for political power and supremacy. But it will not follow from this doctrine that acts of the larger society, which are not pursuant to its constitutional powers, but which are invasions of the residuary authorities of the smaller societies, will become the supreme law of the land. These will be mere acts of usurpation, and will deserve to be treated as such. Hence we perceive that the clause which declares the supremacy of tho Union, like the one we have just before considered, only declares a truth which flows immediately and necessarily from the institution of the federal government.”
The doctrine that the Supreme Court of the United States is the tribunal constituted to determine all questions touching the extent of the powers of the state and the federal governments, and with authority to restrain the action of the sovereign power of'the states by annulling state laws and reversing the judgments of the state courts, imports, and extraordinary exercise of power, for which there should exist a clear and express warrant in the constitution. The question of the existence' of this power has been very *410, 411 •^frequently brought before .the Supreme Court of the United [41® States, and instead of meeting the question, and showing an unquestionable authority for it in the constitution, that tribunal has attempted to maintain it upon various other grounds, and, among the rest, by a resort to an argument founded on the supposed danger of the abuse of power by the states, derogatory to the sovereign ■character of the states. Mr. Justice Story, in the case of Martin v. Hunter, to maintain this alleged power, said: “ The constitution has presumed (whether rightly or wrongly we do not inquire) that state attachments, state prejudices, state jealousies, and state interests might ■sometimes obstruct or control, or be supposed to obstruct or control, the regular administration of justice.” Although our government was ■designed to be a government of cheeks and balances, to restrain "the abuse of power in all its departments, this argument of the learned judge is not strictly in character with the subject of which he speaks. In the case of Cohens v. Virginia, McCulloch v. Maryland, and several other cases, language similar in effect has been used by the Supreme Court of the United States, imputing interested motives, prejudice, and passion to the state courts, as the reason for its own jurisdiction. And in the case of Gordon v. Longest, 16 Peters, 98, that court adjudged that one great object •of the establishment of the federal courts, and regulating their jurisdiction, was to have a tribunal in each state presumed to be free from local influence 1 Now, it is at least novel that a judicial tribunal should claim jurisdiction for itself upon the ground that other courts equally disinterested would be subject to improper motives and influences. Where there has been judicial-action by a court of competent jurisdiction, all presumptions are in favor of the correctness of the adjudication while it remains in force, and the imputation of improper motives or influences are not to be ^allowed. It is essential to the supremacy of all civil govern- [411 ment that the passions and motives of men should not be imputed to the exercise of sovereignty. Although it is undoubtedly true that the feelings of men do enter more or less into most of the acts of sovereign power, yet it can not be allowed for one set of men clothed with power to allege the danger of the abuse of power by others, in the exercise of authority, as a foundation upon which to build up power for themselves. In reference to the language of the Supreme Court of the United States, in the case of McCulloch v. Maryland, the Court of Appeals of Kentucky placed this subject *412 in a view so forcible and strong that 1 deem it proper to make the following extract from the opinion, in the case of The Commonwealth v. Morrison et al., 2 Kentucky, 537:
“ The power to do good is, throughout all agency, except that of absolute perfection, the power to do evil. If the power of action were denied to all who could not pervert it, Deity alone could act. Rut the doctrine upon which the agency of the world hangs, is the very reverse : it is that power possessed may be used subject to the responsibility of the agent for its abuse. And it is upon this principle alone that we can have any just notions of morals, and of rewards and punishments. But sovereignty has a fictitious perfection and purity, which must be taken as real, and which can not be controverted. Of course the abuse of power can not be imputed to a sovereign, in restraint of its legitimate energies. The maxim that the king can do no wrong is not an idle device of royalty formed to amuse or beguile the multitute; nor is the correspondent maxim, that the voice of the people is the voice of God, the offspring of the demagogue’s brain. They are both just inferences drawn from the most profound views of civil policy, and illustrate the position advanced in relation to the purity and 'perfection of sovereignty. It is not that the king in a monarchy, or the people in a democracy, can do no wrong — for we know they are men, and. of course partake of the frailties inseparable ■ from, human nature .as men they err frequently and egregiously. But it is the sovereignty with which they are invested, and in which they are merged, that is incapable of error. This incapacity in the sovereign to err, is matter of necessity. There is no tribunal before which the sovereign can be arraigned, his conduct examined, his errors and delinquencies detected, those errors corrected, and he punished. 412] Sovereignty, therefore, whether ^displayed in the monarch or th.e multitude, possesses necessarily this putative perfection;, and is of course necessarily irresponsible. Upon this purity and unerring character of sovereignty depends all the jurisdictions which are exercised in the governments throughout the world. Government could not exist upon any other hypothesis.”
But it seems to have been deemed necessary even to humble and degrade the sovereignty of the several states, in order to maintain the high assumptions of power claimed for the federal government.
Where is the provision of the constitution to be found, which ordains the Supreme Court of the United States as the only tribunal, or the tribunal of last resort, to determine all questions or contro, versies touching the boundary of the jurisdiction of the two governments, state and federal ? The people were sparing and cautious in the powers they conferred on the geueral government, and par *413 ticular to have them expressly and clearly defined. It is fair to presume that so important a matter as this would not have been left to-mere implication or construction, had it been the intention to confer it. It is true, the “ Federalist ” comes in as authority to sustain this assumption. In the thirty-ninth number of his work, Mr. Madison used this language : “ It is true, that in controversies relating to the boundary between the two jurisdictions, the tribunal which is ultimately to decide, is to be established under the general government.” But if nothing else, the loose opinion here expressed, of itself, is'most clearly sufficient to show that this work is not to be relied on in a legal investigation; because Mr. Madison, after ten years’ observation of the practical operations of the government, under the federal constitution, upon the most grave and deliberate consideration, expressed a directly opposite opinion, in his celebrated report and resolutions, adopted in the legislature of Virginia, in January, 1800, the following extract *from which, will be [41S found conclusive and unanswerable on this subject:
“ On this objection it might be observed, first, that there may be many instances of usurped power which the forms of the constitution would never draw within the control of the judicial department ; secondly, that if the decision of the judiciary be raised above the authority of the sovereign parties to the constitution, the decisions of the other departments, not carried by the forms of the constitution before the judiciary, must be equally authoritative and final with the decisions of that department; but the proper answer to the objection is, that the resolution of the general assembly relates to those great and extraordinary cases in which all the forms-of the constitution may prove ineffectual against infractions dangerous to the essential rights of the parties to it. The resolution supposes that dangerous powers, not delegated, may not only be usurped and executed by the other departments, but that the judicial departments also may exercise or sanction dangerous powers-beyond the grant of the constitution, and, consequently, that the ultimate right of the parties to the constitution to judge whether the compact has been dangerously violated must extend to violations by one delegated authority as well as by another, by the judiciary as well as by the executive or legislative.
“ However true, therefore, it may be, that the judicial department, is, in all questions submitted to it by the forms of the constitution,, to decide in the last resort, this resort must necessarily be deemed the last in relation to the authorities of the other departments of the government; and not in relation to the rights of the parties to the constitutional compact, from which the judicial as well as the.other departments hold their delegated trusts. On any other hy *414 pothesis, the delegation of judicial power would annul the authority ■ delegating it; and the concurrence of this department with the others in usurped powers might subvert forever, and beyond the possible reach of any rightful remedy, the very constitution which .all were instituted to preserve.”
If the Supreme Court of the United States is constituted the tribunal of last resort, to determine all controversies touching the extent of the powers of the two governments, it must be either by an • express grant in the constitution or by its being incidental to some ■ express power. As there is no express grant of this kind in the .constitution, I inquire, to what express power in the constitution is this incidental; or, in other words, in what express grant is it 414] *implied as a necessary means of executing the express power ? For there can be no contingent without a principal. It will not be pretended that it is incidental to any of the legislative • or any of the executive powers delegated in the first and. second .articles of the constitution. Can it be derived from any of the powers of the judiciary, in the third article? And, if so, which • one? It has been' already shown that the appellate power of the .Supreme Court conferred in this article manifestly extends no further than appeals from the subordinate federal courts. And as to the provision which defines the subjects of the jurisdiction of the .-federal judiciary, it has been already shown that the jurisdiction of the federal courts is not made exclusive; and it is an undeniable fact that, since the origin of the government, the concurrent jurisdiction ■ of the state courts over many of these subjects has been exercised and universally conceded. By no rational implication, therefore, can it be deduced from this provision. Where, then, is this power to be found in the constitution? It can not be derived from any of the miscellaneous provisions of article fourth, or the amendatory provision of article fifth. The second clause of the sixth article de•clares that the constitution of the United States, and the laws made in pursuance thereof, shall be the supreme law of the land, and that the judges in every state shall be bound thereby; and the next succeeding clause requires of the officers of the state governments an oath to support the constitution, etc. There is clearly nothing here conferring upon the Supreme Court of the United •States the important power in question. This mere declaration of the character and operative effect of the constitution, laws, etc., of ■the United States, is no grant of power. And it is admitted that *415, 416 the constitution and laws of each state are equally the supreme law of the land within the sphere of their operation. Suppose an act-^passed by Congress, not in pursuance of the constitution of [415 the United States. It is not required to be regarded by the state-judges as the supreme law of the land. Indeed, their oath to support the constitution of the United States would require them to-disregard it. But where is the provision of the constitution which makes the Supreme Court of the United States the exclusive arbiter^ or tribunal of last resort, to determine whether the laws be made-pursuant to the constitution or not? If this power be .necessary, and yet not delegated, the constitution should be amended. A power of such grave import should not be exercised without a clear-warrant for it in the constitution. It will xjot do to conclude that-a power has been delegated by the constitution, simply because we-may conceive it to be highly necessary and proper, when we are-unable to find authority for it in the constitution.
But, it not only appears that the constitution contains no provision giving to the Supreme Court of the United States, any such-power; but it appears from the public records, that the convention which framed the constitution, positively refused to confer on the-federal government, any such supervisory power over the states. The proposition was made in the convention repeatedly, and in a. great variety of forms, but in every instance, and every form in which proposed, it was finally defeated. The first project for a constitution submitted in the convention, was by Edmund Randolph, which proposed to vest this supervisory power in a national', legislature. See 2 Madison Papers, 732. This was changed in the committee of the whole, to which Mr. Randolph’s proposition was referred, and a provision reported, giving to the “ national judiciary, jurisdiction of all questions which involve the national peace and harmony.” Same vol. 861. Charles Pinckney’s draft of a constitution submitted to the convention, ^contained' a proposi- [416-tion, that, “the legislature of the United States should have the power to revise the laws of the several states that maybe supposed to infringe the powers exclusively delegated by this constitution to-Congress, and to negative and annul such as do.” Ibid. 745. On page 821 of this work, we learn that Mr. Pinckney made his proposition to vest this power in the national legislature, by motion, in committee of the whole. Pending the discussion of this proposition, Mr. Madison suggested lodging this power in the senate alone.. *417 Page 827. Mr. Hamilton’s draft of a constitution, contained a ■proposition, providing by express declaration that all state laws • -contrary to the constitution and laws of the United States, should be utterly void; and further, that the governor, Or president of each estate, should be appointed by the general government, with a negative upon all such laws at the time of their passage. Ibid. 892.
When, therefore, the constitution not only contains no provision, -conferring upon the federal government this supervisory power -over the states, but when the proposition to confer such a power was distinctly and repeatedly made in various forms in the consti•tution, and in every instance finally defeated, and when, on the .-adoption of the constitution, some of the states required an amend-ment to the constitution, which was agreed to, expressly providing •that all powers not delegated by the constitution were reserved, with what fairness and sound reason can the delegation of a power be insisted upon, so important in its import, so controlling and ab•■sorbing in its operation, and so utterly destructive of the equality ..and independence essential to the very existence of co-ordinate powers. It is idle to speak of the two governments as being independent and co-ordinate, of each being supreme within the sphere • of its own powers, if one has the exclusive power to determine 417] *all questions touching, not only the extent of its own pow- • ers, but also the extent of the powers of the other. Our sys tern of goverment was established upon the principle of a division of political power, with a view to checks and safeguards to prevent ■ its abuse. And it is a fair conclusion that it'was not the intention • of those who ordained and established it to vest discretionary or . arbitrary power in any department of the government. It has beén the boast and pride of this country that our system of gov- ■ eminent rested not, like the arbitrary governments of other coun- • tries, upon physical power, but on an enlightened public opinion, on the regard of the people for principle, right, and justice, a practical • concession of the right and the capacity of the people for self-government. A philosophical principle was adopted, believed to be applicable to the political as well as to the material world, that all ■ organic action, whether of human or divine mechanism, is the result of the reciprocal action and reaction of the parts of which it consists, and capable of restricting its various powers to their .appropriate spheres, and compelling the performance of their-.respective functions. This was accomplished by a division of polit *418 leal power, and calling into operation cheeks and safeguards against its abuse by the' mutual action and reaction of the various departments upon each other. And in regard to the most important-power of government, that of the supreme power, which, aceoi’ding ■to all experience, had never failed, in other countries and ages to •overleap all the barriers and restraints of human contrivance, two •equal and co-ordinate governments, state and federal, were established, each equally supreme within its appropriate sphere of .action; and as to the boundary which separates their powers and .limits their extent a mutual check upon each other. This made each the protector of the powers assigned to it, and of which it is the ■organ and the representative. *Without this mutual check [418 or power of each to restrain the other to its appropriate sphere, the stronger would finally absorb the supremacy of the weaker and •concentrate all power in itself.
That collision or conflict of these co-ordinate powers might arise, was not beyond anticipation. That is an occasional incident of •every division of power, whether it be that of co-ordinate departments, co-ordinate estates or classes, co-ordinate governments, or any other division of powers appertaining to government. It is -one of the evils to which constitutional government based on a ■division of powers must be always, to some extent, exposed. But we have to take things as they are, with all their incidents, good ■or bad, as perfection is not to be found in human institutions, and the choice is between a constitutional government of limited powers and an absolute government exposed to all the oppressions and abuses incident to uncontrollable power. In case of collision or -conflict of authority between these two co-ordinate governments, neither can claim by the constitution the exclusive and arbitrary power of determination, and of enforcing its decision by physical power. If a single state had the power, sua sponte, to nullify a law .of the United States, and arrest its operation by its own act, that would destroy the independence of the federal government as an equal and co-ordinate power with that of each state. The federal government and that of the several states being each supreme within their respective spheres of action are clothed each with authority to enforce the execution of its own laws. But in case of ■conflict between the authorities of the two governments in the execution of their respective powers, the controversy will ordinarily give rise to a question which would go before the judicial trib *419, 420 unals. If it arise in a case over which the state courts have-419] ^exclusive jurisdiction, their determination will be final and conclusive as to the parties in the case; if in a case over which the-federal courts have exclusive jurisdiction, their determination will be final. But if the question arise in a case over which the courts of the two governments have concurrent jurisdiction, the determination of the courts of that in which the jurisdiction first attached must be final and conclusive upon the parties in the case. In case the principle settled in the state courts be wholly inconsistent and irreconcilable with that settled in the federal courts, and from this conflict of decision or otherwise a conflict of authority in the execution of the,, laws ensue, the adjustment of the difficulty must be-transferred from the delegated trusts of civil authority to the sovereign power resting in the people of the several states. If this-sovereign power, acting through the ballot-box, not only upon legislation, but also upon the executive and upon the judicial powers of the two governments, fails to supply the requisite corrective, there-remains the further remedy of amending the constitution. These are the peaceable remedies provided by the constitution. If these all fail — if, notwithstanding appeals to public sentiment, remonstrance, and negotiation, with all proper forbearance, the federal government, for example, should recklessly persist in a course of usurpation of power utterly destructive to the independence and sovereignty of the states, there could remain no course but a resort to the original rights of the people of each state as an independent community.
It has been supposed by some that inasmuch as the supreme-judicial power of the United States was controlled by great and good men, and learned, experienced jurists, there could be no danger-of intrusting the' determination of all controversies touching the-extent of the powers of the two governments to their judgment 420] and *discretion. Although this is not strictly pertinent to the-question of the competency of the power, yet it may be remarked that the highest moral obligations — truth, justice, and plighted faith, have never furnished a safe and certain barrier against the abuse of power — that when intrusted with arbitrary power, human nature has very rarely been found proof against the shifts and devices of cupidity and ambition. No man has a higher respect, and, indeed, greater veneration than I have, for the great and good men who have adorned the bench of the Supreme Court of the United-. *421 States. Ohio is now, and has been for many years, honored with one of her most illustrious citizens on that bench, in whose integrity and elevated purity of character I have confidence. It is known full well that he would not willingly abuse any trust of civil power, and there is no man living to the rectitude of whose intentions I would sooner trust arbitrary civil power than to him. But infallibility of judgment is not an attribute of human nature.
It is urged that some authority is absolutely necessary as the supreme and final, arbiter of all conflicts of power between the federal government and the several state governments. If this be true, it is an argument in favor of an amendment of the constitution, rather than an assumption of power by the federal government. A supposed necessity will not warrant an assumption of power not to be found in the constitution. If a supreme and final arbiter, to demine all questions of conflict of power between the federal and state governments, be necessary, it should belong exclusively neither to the federal nor to the state governments, but it should be an intermediate power, selected by the consent of both, and under the exclusive control of neither one. This would leave the federal and the several state governments equal and co-ordinate governments, each *a salutary check upon the other in any attempt to exercise [421 an unwarranted power.
I humbly conceive that the independent co-ordinate authority of the several states, as a check upon the general government, is a matter of great and essential importance to the safety and purity of our institutions; and that, if the arbitrary power be conceded to the federal government, to determine all controversies touching not only its own powers, but also those involving the powers of tho several states, it must subvert the whole theory and structure of our government, and result in a consolidated national government.
At the time of the adoption of tho constitution of the United States it was insisted by many that it was necessary to fortify the powers of the federal government against the powers and influence of the states; that the states would form combinations against the federal government; and that the weakest point in our system of government was a tendency to dissolution. The practical operation of the system has shown the utter fallacy of this opinion. The separate I and distinct interests, local attachments, and rivalries between sev- ' eral states have counteracted all tendency to form combinations of this kind. And in almost every instance which has occurred of a *422 •conflict between the powers of a state and the federal government, the contest has been a most unequal one, for the state has had a ¡struggle not only against the powers and influence of the general gov•ernment, but also against a combination of the other states, uniting their power and influence with that of the general government. It is manifest that an element has entered into the operations of our ¡system of government not fully anticipated at the time of its formation. The vast patronage and extensive emoluments of the general ¡government have become an all-on grossing object of attention, and ■422] concentrated a power and influence which ^enable the federal government to bring to its aid not only organized combinations of the people, but also combinations of the greater parts of the states.
It was supposed by the framers of the constitution that the powers of the federal government would bo held in check by the popular elections. The practical operation of the system, however, has •demonstrated the utter fallacy of this expectation. The change of ¡administrations and officers under the federal government, as a .general thing, seems to have had but little effect other than to bring a fresh supply of persons into i>ower, who struggle with renewed vigor and increased recklessness for their various purposes of ambition, cupidity, and aggrandizement.
The persons in the service and interest of the federal government throughout the vast expanse of country from the Atlantic to the Pacific, upon^the high seas, and in foreign countries, must ex-need two hundred and fifty thousand in number; and the dependents and aspirants, who arc expecting to profit by the powers of the federal government, are more than five times that number. Besides this, the extensive power and influence of the associated wealth of the country, under the special privileges and immunities ■of corporations, have become, by means of the adjudications of the federal judiciary, attached to the supremacy of the federal government by the all-controlling tic of self-interest. With such an accumulation and concentration of interest and influence, the federal •government, collecting and disbursing annually a revenue of from ¡sixty to eighty millions of dollars, with the entire control of all the military and naval forces, of all the military fortifications and munitions of war throughout the country, wields a power surpassed by but few governments in the world.
With its immense resources, vast patronage, and extensive emoluments, concede to the federal government the constructive powers *423, 424 '•*to the full extent claimed .for it, unchecked by the co-or- [423 ■dinate powers of the several states, and nothing short of. a revolution can prevent it becoming absolute.
The doctrine of the Supreme Court of the United States, announced in the case of McCulloch v. Maryland, Osburn v. The Bank of the United States, Cohens v. Virginia, and other cases, invests Congress with discretionary power of the most extraordinary char.aeter, derived from inference and implication. It is not required that the purpose of the measures adopted as a means to carry into execution the express powers should have this exclusively, or indeed, mainly in view. It is sufficient, according to this doctrine, to •sustain the constitutionality of a measure, if the execution of an ■express power be a mere incident to a measure, designed to effectuate other immediate and ulterior objects, however great in their consequences. For example, in the case McCulloch v. Maryland, the constitutionality of the Bank of the United States was sustained, .as among the implied powers of Congress. The main object of this measure was, of course, the investment of the private capital of persons in the business of banking, lending money, discounting bills, receiving money on deposit, and issuing bank-notes for circulation. This of itself, it was not pretended, that Congress had the power to authorize. But inasmuch as the bank could be incidentally used as a place for the deposit and safe-keeping of the money ■of the government, therefore this measure, most important for other purposes, was sustained as among the means selected by Congress for the execution of the express powers of the government ; and not only so, but the extensive investments of private property in the stock of this institution, in the several states, was ■declared to be withdrawn from the sovereign power of taxation-by ■each state, because'the bank was thus incidentally used by the fed■eral government. *Under the simple■ power “to establish [424 post-offices and post-roads,” the authority has been claimed not •only to construct roads, but to make canals, and engage in a generaL ■system of internal improvements in the states. And under the power “to raise and support armies,” with a'view to the transportation of supplies and the munitions of war, the authority has been ■claimed to engage even in the construction of railroads in foreign countries. A less violent implication would enable the federal government to provide for a system of military espionage in every city, hamlet, or neighborhood throughout the country. By such *425 stretch of authority, by way of implication, inference, pr construction;, what stupendous scheme of aggrandizement, and enlargement of its powers, may not the general government embark in, and sustain its constitutionality on the ground that it incidentally, or in some way aids, or can be used as a means to aid in carrying into execution some of the express powers of the government, although the chief and main purpose of the measure be an entirely different and ulterior object.
"With this doctrine of constitutional construction established, concede to the federal government the power to determine in the last, resort all controversies touching not only the extent of its own powers, but also the boundaries of the powers between the several-states and the federal government, and all the safeguards and limitations of the express provisions in the constitution would be easily overcome by the ingenious devices of implication and construction. The ultimate result would be inevitable. The states would be-stripped of their sovereignty and independence, and the federal government become, in effect at least, a consolidated national government, concentrating all supremacy in itself. Civil power thus, uncontrolled and absolute in a government so extensive in its operations, and with 'means and resources so vast as those of the 425] United *States, would eventuate in the long train of abuses and oppressions, which have never failed to follow in the course of arbitrary civil power.
It is clear, that it was not contemplated at the time of the formation and adoption oí the constitution, that any such exorbitant powers were to be conferred on the federal government; and by a strict and fair construction of the constitution, no such powers can be maintained.
From the foregoing views, the following conclusions are deduced r
1. That the provision of the constitution of the United States expressly conferring appellate jurisdiction on the Supreme Court, does not authorize the exercise of appellate power by that tribunal, over the state courts, but extends simply to appeals from the subordinate federal courts. ‘
2. There is no provision in the constitution from which a supervising power of the Supreme Court of the United States, over the state courts, can be derived, by way of incident or implication.
3. The Supreme Court of the United States has not been constituted the exclusive tribunal of dernier resort, to determine all *426 -controversies, in relation to conflicts of authority, between the federal government and the several states of the American Union.
4. That the state courts and the federal courts are co-ordinate tribunals, having concurrent jurisdiction in numerous cases, but neither having a supervising power over the other; and that, where the jurisdiction is concurrent, the decision of that court, or rather of the courts of that judicial system, in which the jurisdiction first attaches, is final and conclusive as to the parties.
This view of the constitutional powers of the government is sustained by an authoritative construction, adopted in this state at an early period. In 1820, the attention of *the people was [426 ■drawn to the consideration of this question by the high-handed measures taken to protect the property of the stockholders of the Bank of the United States, within this state, from .taxation. The subject was brought before the general assembly and referred to a committee, by whom a report was made, through the late Charles Hammond, one of the most eminent jurists of the country, as chairman of the committee, reviewing and exposing, with great ability, the unwarranted assumptions of power by the federal judiciary ■over the states. See Journal of House of Representatives, of December, 1820. This report, together with a series of resolutions accompanying it, was adopted by both branches of the general assembly, in January, 1821. The following are among the resolutions :
11Resolved, By the general assembly of the State of Ohio, that, in respect to the powers of the governments of the several states that compose the American Union, and the powers of the federal government, this general assembly do recognize and approve the doctrines asserted by the legislatures - of Kentucky and Virginia, in their resolutions of November and December, 1798, and Jannary, 1800, and do consider that their principles have been recognized and adopted by a majority of the American people.
“Resolved, further, That this general assembly do protest against the doctrines of the federal circuit court, sitting in this state, avowed and maintained in their proceedings against the officers of state, upon account of their official acts, as being in direct violation of the eleventh amendment to the constitution of the United States.
“Resolved, further, That this general assembly do protest against the doctrine that the political rights of the separate states that compose the American Union, and their powers as sovereign states, may be settled and determined in the Supremo Court of the United States, so as to conclude and bind them, in cases contrived between individuals, and where they are, no one of them, parties direct.”
*427, 428 This was not a mero legislative inteprotation of the constitution,, but a solemn declaration of the principles which form the basis of the relation between the state and the federal government, made by the people of the state, through their constitutional representatives, 427] on full and ^deliberate consideration, and, as such, formally-communicated to the other states of the Union, and to the authorities of the federal government.
Within a few years after the organization of the government, under the federal constitution, the people, in some of-the states, became alarmed at the unwarranted and startling assumptions of power by the authorities of the federal government. And this led to the adoption of the celebrated resolutions of the legislatures of Kentucky and Virginia, in 1798 and 1800, above mentioned, which constitute an important item in the public history of the country. These resolutions, which originated with Jefferson, Madison, John Taylor, and other eminent statesmen of the American revolution, declare a doctrine, as to the powers of the federal and state governments, in strict accordance with the views which I have here expressed, and attempted to maintain.
II. I maintain, further, that if it be conceded, for the sake of the-argument, that this appellate power, in the federal courts, over the state courts, could, to any extent, exist consistently with the true-theory of our system of government, that yet, there existed no-ground whatever for its exercise in t'he particular case before us.
The tax law of 1851, which the federal court has assumed to declare unconstitutional and void, is a mere state revenue law, enacted in good faith, with a view to establish an equal andj'wsf system of taxation, to support the state government. It can not be pretended that this law, in any way whatever, affects the bank, except by the imposition of a tax upon its capital equal to that, which was, at the time, imposed on the property of other persons in the state. And it can not be pretended that this law, in its operation, in any way 428] whatever, interferes with, or ^Obstructs the just and full exercise of the express powers of the federal government. If this-extraordinary power, claimed for the federal judiciary, is to be tolerated to any extent, it can not be extended beyond the cases falling within the sphere of its clearly defined powers.
The authority delegated to the federal government relates mainly, if not solely, to the relations of the United States with foreign nations, and with the several states and the citizens thereof; and *429 the relations of the several states with each other, and of the citizens of different states. The relations of the citizens of each state, with their state government, is left exclusively to the authority of the state. The controversy, in this case, affects solely and alone,, the relations of persons within the State of Ohio, and between them and the state government — imposing a just and equal tax upon property, admitted to be within the jurisdiction of the state — exacting a just and equal tribute, for the support of the government, in return for the protection and advantages afforded to the rights of property, and in no way whatsoever connected with the foreign relations of the country, or the relations between the several states, or citizens of different states. This law, therefore, interfering in no¡ way whatever with the operation of any expiress 'power delegated to the federal government, in truth and reality produces, in no conceivable manner, any conflict with any delegated authority of that government.
It is claimed, however, that this law is in conflict with the provision of the tenth section of the first article of the constitution of the United States, which declares, that, “No state shall pass any law impairing the obligation of contracts.” This is simply a limitation on the powers of the states, and not a positive grant of authority to the federal government. It is merely prohibitory in its operation, and does not go beyond the denial of the power, or the disability ^imposed. It does not go further, and provide that when- [429 over any state shall pass any law in violation of this prohibitory clause, the Supreme Court of the United States shall, have the power to annul it, by declaring it unconstitutional and void. What, then, is the legitimate operation of this mere negative provision in the constitution, which most clearly confers no positive power on the federal government ? It can fairly go no further than to impose the limitation on the power of the states; and the question of the conflict of a law with this constitutional prohibition, can only come before the Supreme Court of the United States, by its being involved in a case, in which the jurisdiction of the federal judiciary is otherwise acquired, in the exercise of some positive authority, conferred by the constitution on the federal government. If a state shall pass a law impairing the obligations of a contract — when that law, in its operation, shall affect any right connected with the foreign relations of the country, or the relations between the several states, or citizens of different states, falling within the province of *430 the federal government; or, when it shall otherwise conflict with some authority delegated by positive or express grant in the constitution, then, and not till then, can a case arise in which the power of the federal judiciary can be invoked to declare the law void.
The constitution of Ohio, under which the law in question was enacted, contained a provision in the following words : “No ex post facto laws, nor any laws impairing the validity of contracts, shall ever he made.” See constitution of 1802, section 16. Although not in the identical words of the provision in the constitution of the United States, the language of the state constitution is the same, in effect. If the prohibitory clause of the constitution of the United States was designed to be unlimited in the sphere of its operation, 480] going beyond the nature and scope of the ^positive powers granted to the federal government, then the prohibitory clause in the state constitution, was wholly superfluous and unnecessary. Hid those who framed this state constitution commit the vain and foolish act of inserting in the state constitution mere idle repetition of the provisions in the constitution of the United States, imposing limitations on the powers of the state to no purpose ? This would not be a rational conclusion, nor would it comport with the wisdom of the laws. This provision in the constitution of the state, and the similar provision in the constitution of the United States, must be construed with reference to each other, and with reference to the nature and the general scope of the powers of the two governments. With this view, all difficulty, by way of repetition or conflict, is avoided. The provision in the constitution of the United States can be made operative to the extent of, or within the sphere of the powers delegated to the federal government; and that of the state constitution within the sphere of the powers of the state government. It is only, therefore, where the question of the validity of such a state law arises under some express grant of power, or positive authority conferred on the federal government,, that the powers of the federal judiciary can be invoked to declare it unconstitutional.
This is consistent with a fair interpretation of 'the second section of the third article of the constitution (recited supra), defining the extent of the judicial power of the United States. The first clause of this section, providing, in general terms, that the judicial power of the United States shall extend to all cases, in law or equity, arising under the constitution, laws, and treaties of the United *431, 432 'States, is followed by a particular enumeration of the various classes of cases, or objects, to which it shall extend, in the words following: “-To all cases affecting ambassadors, other public ministers [431 and consuls; to all cases of admiralty and maritime jurisdiction; to controversies to which the United States shall be a party; to controversies between two or more states; between a state and citizens of another state; between citizens of different states; between citizens of the same state, claiming lands under grants of different states; and between a state, or the citizens thereof, and, foreign states, citizens, or ■subjects.”
Now, why this special enumeration of the particular subjects for the exercise of the judicial power of the United States, when the .general language of the first clause of the section would compre hend all cases arising under the constitution, laws, and treaties of the United States, covering all the specially enumerated classes of cases? It is a familiar rule of interpretation, that, where an instrument delegating powers contains a provision, on a particular •subject, general in its terms, but followed by specifications of particular instances for the exercise of the authority, the particular specifications operate as a limitation upon the general grant; so that this provision of the constitution is substantially the same as if the words had been, “the judicial power shall extend to all cases arising under the constitution, laws, and treaties, of the United States, in the following enumerated classes of cases, to wit, etc.,’’ giving the specifications contained in the section. The phraseology of this provision is like that of the eighth section of the first article of the constitution, enumerating the powers of Congress, which commences with a grant of power, in general language, “ to lay and collect taxes,” etc., “ and to provide for the common defense and general welfare,” etc.; and which general language is followed, by a particular enumeration of the powers of Congress. Now, it is not pretended that Congress has a general grant of power to provide for the general welfare at discretion, which would of itself make Congress a *body of almost unlimited powers. On the con- [432 trary, it appears to be the settled construction of the constitution, that the grant of power to Congress, “ to provide for the common defense and general welfare,” is limited to the particularly enumerated powers, and can only be properly exercised pursuant thereto. The judicial power of the United States, therefore, extending to all cases arising under the constitution, laws, and treaties of the United States, must, by every fair rule of interpretation, be confined to all *433 cases falling within the expressly enumerated classes, or objects, and which, 'in fact, include all the cases falling within the appropriate sphere of the federal government; but none of which enumerated classes would include such a case as that before us.
Indeed, I must be permitted to say, with all due deference, that, by no acknowledged 'rule of interpretation, can the constitution extend the judicial power of the United States to a case such as this was, before the Supreme Court of the United States. A case arising under the constitution, laws, or treaties of the United States, is a suit instituted in one of the federal courts which, on account of either the parties thereto or the subject-matter thereof, comes within the sphere of the positive authority or delegated powers of the constitution. And as the-judieial power here is not extended to all questions touching the constitution, laws, etc., of the United States, and as the prohibitory clause, as to the power of the states to pass laws impairing the obligation of contracts, is merely negative, and confers no positive authority qn the federal government, the mere question of conflict of a state law with this prohibitory clause alone, without any other ground of jurisdiction, does not confer the positive authority necessary to bring a case involving the question within the operation of the positive grants of power to the federal govern-433] ment. There was good ^reason, therefore, for the provisions of the constitution of the United States requiring that the judicial officers of the several states shall be bound by the constitution, laws, and treaties of the United States, and under an oath of office to support the same. The judicial power of the United States is coextensive with the delegated powers of the federal government, but it can not be constitutionally extended any further. If the limitation upon the powers of the states, by this prohibitory clause of the constitution, contained any grant of power, or positive authority, to the federal government, it might be claimed that the power of the federal government to'review the laws of the states, and annul such as might be found to impair the obligations of contracts, was implied as a necessary means of carrying the power delegated into execution. But by no fair or rational interpretation, can this more negative and prohibitory clause, in itself, delegate any positive power to the federal government. And the clause of the constitution, in relation to the implied powers, authorizing Congress to make all laws necessary and proper, for carrying into execution the powers vested by the constitution in the federal government, h as *434 plain and direct reference to the enumerated powers expressly and-positively delegated and defined by the constitution. This construction gives this prohibitory clause an operation eo-extcnsive with the delegated powers of the federal government,'and yet limits it to the sphere of those powers. To extend the delegated powers-of the federal government to an indefinite or unlimited extent, in order to give an unlimited operation to this prohibitory clause,, would be wholly inconsistent with the nature of the powers of that government, and a plain invasion of the sovereignty of the states.
This view of the subject is strengthened by the doctrine'of the- “ Federalist,” to which I take the liberty of referring *again, [434 not because it is entitled to weight as authority, but because it is-mainly relied on by the Supreme Court of the United States, and those who insist upon the appellate power of that tribunal over the-state courts.
Mr. Madison, in the forty-fifth number of this work, said:
“ That the powers of the general government axe few and defined,. and exercised principally on external objects, as war, peace, negotiation, and foreign commerce; while the powers of the several state governments are numerous and indefinite, extending to all the objects which in the ordinary course of affairs concern the lives, liberties, and properties of the people, and the internal order, improvement, ant prosperity of the state.”
In the thirty-second number of this work, Mr. Hamilton said:
“ I am willing here to allow, in its fullest extent, the justness of the reasoning, which requires that the individual states should possess an independent and uncontrollable authority to raise their own revenue for the supply of their own wants, and making this concession, I affirm that (with the sole exception of the duties on imports and exports) they would, under the plan of the convention, retain that authority in the most absolute and unqalified sense; and that an attempt, on the part of the national government, to abridge' them in the exercise of it, would be a violent assumption of power,, unwarranted by any article or clause of its constitution.”
Again, in number thirty-three, the same author adds :
“ The inference from the whole is, that the individual states would,, under the proposed constitution, retain an independent and uncontrollable authority to raise revenue, to any extent of which they may- *435 •stand in need, by every kind of taxation, except duties on imports .and exports.”
The power to raise revenue, by taxation, is the vital principle of the body politic; it is that which enables every government to sustain its life and motion, and to perform its most essential functions. "Without this power, in its full vigor, it is idle to talk of any such a thing as sovereignty in a government. And, it is an undeniable requisite, inherent in the essence or very nature of this power itself, that the burden of taxation be ■ apportioned with all 435] *practicable equality and fairness. The power of taxation, like the power of legislation, and every other attribute of sovereignty with which the government is endowed, is a trust of civil ,authority, which the people, in their original capacity, delegated, with a sole and exclusive regard to the public interests. The idea that the legislative power can abridge this delegated trust of sov•creignty by contract, or special immunities, to a favored part of the • community, or stipulate for unfair and unequal taxation, is preposterous, repugnant to the inherent nature and object of the del- ■ egated trust itself, and abhorrent to the reason and common sense of every fair and impartial mind. And the doctrine that the judicial power of the United States can interpose, as the sole and exclusive judge of the extent of its own power, and also of that of the states, and under the pretense that the legislative power not only can so abridge this power by contract, but has so done, reverse and set aside the solemn adjudication of the Supreme Court of a state, .•and nullify a state revenue law, puts an end to all idea of independence or sovereignty in the state ? How can a state be said to retain the power of taxation, “ in its most absolute and unqualified sense,” or ro be “ independent of, and uncontrollable by, the federal government, in its authority to raise revenue, to any extent, and by every .kind of taxation, except’ duties an imports and exports,” if the judicial power of the United States can thus control it in the exercise of this power, so essential and vital to its freedom and independence? It is a matter of public notoriety, that some twenty or thirty millions of taxable property, in this state, is now claiming tc bo exempted from equal taxation, under the alleged authority of the Supreme Court of the United States, to reverse the judgments •of the state courts, and control the taxing power of the state, by annulling a state revenue law. And it may not be long before *436, 437 the ^greater part of the taxable valuation in property, in [486 -some of the states, may be claiming similar exemption. The power of the federal judiciary has already interposed by supersedeas to-stay the execution of the judgments of the courts of this state, for-collection of state taxes. And, within the last two years, it has-been a matter of common occurrence, for the judges of the United States circuit and district courts, within the state, in the mere exercise of chamber powers, to stay the collection of the revenues of the state, by injunctions on county treasurers, until the state authorities have been circumvented, to such an extent as to occasion embarrassment, derangement, and confusion in the -finances of the-state, beyond the reach of a full and complete remedy hereafter. And to effect these objects, jurisdiction has been assumed in the federal courts, to defeat the collection of the state revenue, by fictions, and frauds, disreputable to the administration of justice. See Deshler v. Dodge, 16 How. 622, and Dodge v. Woolsey, 18 How. 363.
Among the numerous unwarranted assumptions of power by the federal judiciary, nothing has heretofore been done so startling in its character and its consequences as that which is now attempted against the sovereignty of the people of Ohio. It was-never before claimed, in the exercise of the judicial power of the United States, that the Supreme Court could reverse the judgment of the court of last resort in a state, in the mere matter of the construction of the constitution and statutes of the state, in regard to-the power of taxation; and much less, to annul a state revenue law, in order to protect corporations, from equal and just taxation, by the state under whose authority they derive their existence.
If there be anything well settled, heretofore, by the adjudications-of the Supreme Court of the United States, *it is this: that [487 the construction given to the constitution and laws of the several states by their respective state courts, would be followed by the-federal courts as the true exposition of their own laws. This is-founded on what has been regarded a matter of judicial comity, between the judicial tribunals of different countries and states. It is-the peculiar province of the judicial power of every state- or country, to put the legal construction or interpretation upon its own constitution and laws,- so that it has become a rule of universal operation, that the exposition and construction of the highest judicial tribunal, of a state, given to its own constitution and statutes, forms a part, of, and is incorporated into, its own system of law, and is as obliga *438 tory as any enactment of its legislature. In the case of Elmendorf v. Taylor and others, 10 Wheat. 152, the Supreme Court of the United States decided, on this point: 1. “That the courts of every ..government have the exclusive authority of construing its own local .statutes, and their construction will be respected in every country and, 2. “That this court respects the decisions of the state courts, upon their own local statutes, in the same manner as the state courts .are bound by the decisions of this court in construing the constitution, laws, and treaties of the Union.” In this case, Chief Justice Marshall used the following language:
“ This court has uniformly professed its disposition, in cases depending on the laws of a particular state, to adopt the construction which the courts of the state have given to those laws. This course is founded on the principle, supposed .to be universally recognized, that the judicial department of every government, where such department exists, is the appropriate organ for construing the legislative acts of that government. Thus, no court in the universe which professes to be governed by principle would, we presume, undertake to ■say that the courts of Great Britain or of France, or of any other nation, had misunderstood their own statutes, and therefore erect itself into a tribunal which should correct such misunderstanding. 438] We receive the construction *given by the courts of th e nation ■as the true sense of the law, and feel ourselves no more at liberty to depart from that construction, than to depart from the words of the -statute.”
Again, upon this subject, Chief Justice Marshall said, in the case of Coates’ Ex’r v. Muse’s Adm’r, 1 Marshall’s U. S. Cir. C. 543:
“ It is always with much reluctance that I break the way in expounding the statute of a state, for the exposition of the acts of every legislature is, I think, the peculiar and appropriate duty of the tribunals created by that legislature; although, if a case depending •on a statute not yet construed by the appropriate tribunal comes on to be tried, the judge is under the necessity of construing the .statute, because it forms a part of the case; yet he will yield to this necessity only where it is real, and the case depends upon the statute. The reluctance with which he yields to it is increased when, as in this case, the language of the act is sufficiently ambiguous to admit of different constructions among intelligent gentlemen of the prof ession. In ■such a case, he will be particularly anxious to avoid giving a first ■construction; and will avoid it, if the case can be otherwise decided.”
*439 On this subject, Mr. Smith, in his Commentaries on Statutory and ■Constitutional Construction, p. 746, says:
“Under the peculiar form of government existing in the United ¡States, there is another reason for the adoption of this rule as between the federal courts and the judicial tribunals of the different .■states, or between the judicial tribunals of the different states; that ■is, from' the necessity of the case, to avoid a conflict of construction between the several tribunals, the federal courts, in construing the •statutes of any one of the states, have universally adopted the construction which has been put upon the statute by the judiciary of that .state.”
On this subject Mr. Justice McBean, in the case of Green v. Neal, 6 Peters, 291, said:
“In a great majority of the causes brought before the federal tribunals, they are called to enforce the laws of the states. The rights •of parties are determined under those laws, and it would be a strange perversion of principle if the judicial exposition of those laws by the •state tribunals should be disregarded. These expositions constitute the law, and fix the rule of property. Rights are acquired under this rulo, and it regulates all the transactions which come within its scope.”
* “ Would not a change in the construction of a law of the [439 United States by this tribunal be obligatory on the state courts? ■The statute, as last expounded, would be the law of the Union; and why may not the same effect be given to the last exposition of a local law by the state court? The exposition forms a part of the local laws, and is binding on all the people of the state, and its inferior judicial tribunals. It is emphatically the laws of the state; which the federal court, while sitting within the state, and this .court, when a case is brought before them, are called to enforce. If the rule, as settled, should prove inconvenient or injurious to the public interests, the legislature of the state may modify the law or repeal it.
“ If the construction of the highest judicial tribunal of a state form a part of its statute laws as much as an enactment by the legislature, how can this court make a distinction between them? There could be no hesitation in so modifying our decisions as to •conform to any legislative alteration in a statute; and why should not the same rule apply where the judicial branch of the state government, in the exercise of its acknowledged functions, should, by construction, give a different effect to a statute from'what had at first been given to it. The charge of inconsistency might be made with more force and propriety against the federal tribunals for a disregard of this rule, than by conforming to it. They profess to *440 be bound by the local laws; and yet they reject the exposition of that law, which forms a part of it! It is no answer to this objection that a different exposition was formerly given to the act, which was adopted, by the federal court. The inquiry is, what is the settled law of the state at the time the decision is made.”
No doctrine, perhaps, has been more .frequently and broadly recognized by the Supreme Court of the United States than this.
The decision of the ease before us, which the Supreme Court of the United States claims to have reversed, when placed in its strongest point of view, amounts to nothing more than a matter of statutory construction by the Supreme Court of the state. It was-claimed that the statute of this state, passed in 185T, imposing a tax upon the capital of banks, equal to that imposed by the laws-of the state on the property of individuals, was invalid, on the ground that it impaired the obligations of a contract. And the 440] controversy was not as to the effect or operation of the laws, *if any such contract as that claimed existed; but whether there was any such contract or not; and this depended upon the judicial construction to be given to a provision in the bank law of the state, passed in 1845, and the constitutional power of the legislature to make such a contract. This bank law is a general law of the state, authorizing a general and extensive system of banking, extending into every county, and containing numerous provisions and regulations of general and uniform operation throughout the state. The-only part of this law affected in any way by the tax law of 1851 is the GOth section of the law, fixing the amount and mode for the payment of taxes to the state by the banks. Rut the law contains no express provision fixing any period for the duration of the tax under this 60th section, neither does it contain any provision expressly providing-against its liability to amendment or repeal, by the legislature. It was claimed, however, that this law constituted a binding contract, or stipulation, between the state and each bank organized under it, that the various provisions and regulations of the law should continue in operation, and not be subject to amendment or repeal during the term for which each bank was organized. On the other hand, it was claimed, 1. That the legislative power, including the power of amending or repealing existing laws, as fully as the power of enacting new laws, was, by the constitution, vested fully in the legislature at every session; that the constitution of the state clothed the legislature, which enacted this bank law, with no- *441, 442 authority to limit or abridge, by contract, the power of any future-legislature over existing laws; and that, as this bank law contained no express provision against the exorcise, by any future legislature of the power of amendment or repeal, incident to all laws, that the banks were organized for their respective terms under *the [441 law, upon no obligation on the part of the state, other than that of good faith, which should govern the exercise of the legislative power in regard to all existing laws; and that therefore this law, by the true construction of it, and of the constitutional powers of the legislature which enacted it, could constitute no such contract as that set up; and, 2. That, in regard to the sixtieth section of this bank law, repealed by the tax law of 1851, it was claimed that the constitution of the state conferred no authority upon the legislature to limit or abridge by contract the legislative power of the-state over the right of taxation; and that, as this section contained no provision fixing any period for the duration of the tax imposed by it, or expressly providing against its alteration, by amendment, or repeal, by any future legislature, it could not, by any judicial construction, constitute a contract limiting, by implication, the legislative power of the state over the right of taxation.
The whole question in controversy in the case, therefore, was that of the existence or non-existence of the alleged contract; and this involved, not the construction of any provision of the constitution of the United States, but the judicial construction to be given to a state law, and the constitutional powers of the legislature under the state constitution. And this question of statutory and constitutional construction, under the state government, is one-about which not only intelligent gentlemen of the legal profession have differed, but the judges of the Supreme Court of the United States were divided in opinion. When it is ascertained that a contract actually exists, and a question arises wfiether a state law, in the operation of which the construction of the judicial power of the state has given it, impairs its obligation, a question of the conflict of the state laws with the constitution of the United States is ^presented. But before this question of conflict with the con- [442 jstitution of theUnited States can arise, it-must first be ascertained that ■ such contract does actually exist; and whore the existence of the .contract depends solely on the judicial construction of the state law, and the construction given to the law by the judicial power of the state determines that no such contract exists, no question of *443 ■conflict with the constitution of the United States can arise, upon •which the action of the judicial power of the United States can be ■invoked. If the sixtieth section of the bank law constituted a contract, or a material provision in a contract, binding the state not to interfere with it by amendment or repeal, there could be no ■ 'oubt but that the tax law of 1851, repealing it, impaired its obligations. But the whole controversy involved in this case, was one-touching the existence of any such contract; and this depended, exclusively upon the construction to be given to the state law, and the powers conferred upon the legislature by the state constitution, which, according to the well-settled doctrine of the Supreme Court of the United States, belonged peculiarly and exclusively to the Supreme court of the state. And the Supremo Court of the state having given the judicial construction to this local law, and determined ■that no such contract actually existed, no question of conflict with the constitution of the United States could arise, unless the Supreme Court of the United States could first invade the province •of the state court, and overrule its decision, giving a construction to the state law, and the constitutional powers of the legislature under the state constitution.
It is an undeniable fact that the existence, effect, and validity ■of contracts depend greatly upon the local laws of the state where made. The legality of the subject-matter of contracts — the essen 443] tial legal form and requisites — the-*competency of the parties —the manner of the discharge, etc., must all be left within the range of state legislation, subject only to the qualification, that when a valid contract has been made, and actually exists, according to the legal construction and effect of the laws of the state, no law ■can be passed by the state impairing the obligations by which the parties have bound themselves. Whether the terms and conditions ■of the contract exist by parol agreement, into which the parties have entered,, or by written contract, to which they have subscribed their names, the fact of the existence of the contract must appear in the proof; or, if the contract can arise from the effect or operation given by judicial construction to a statute law, that construction, according to judicial comity between states and nations, and according to the settled adjudications of the Supreme Court of the United States,, must be the construction given to the law by the j udicial power of the state in which it was enacted.
Now, the Supreme. Court of the- state, by formal- and solemn ad *444 judication, gave a construction,'in this respect, to the bank law of 1845, and especially to the sixtieth section of 'the law, and thus .finally settled the question, that-no contract, such as that alleged, actually existed; and also, that, under the constitution of the state, the legislature had no authority to make any such contract. See Toledo Bank v. Bond, 1 Ohio St. 623; also, Debolt v. The Ohio Life Insurance and Trust Company, Ib. 564. These are the only adjudications by the Supreme Court of the state ever made, giving .a judicial construction in this respect to the bank law of 1845.
The learned judge of the Supreme Court of the United States, who delivered the opinion of the majority of the court in the case before us, in reference to this law, remarks *(16 Howard, 381) : [444 “ Up to the year 1851, I believe, the banks, the profession, and the ■bench considered this as a contract, and binding upon the state and the ■banks /”
And it appears that the venerable chief justice of that court, based his opinion in the case, entirely upon the ground, that a uni■form construction, by every department of the state government, •such as that referred to by Judge McLean, had prevailed in Ohio for many years. And the case of The State v. The Commercial Bank of Cincinnati, 7 Ohio, 125, is referred to in the opinions of both these judges, as the foundation for this conclusion. Now, it so happens, that this decision of the Supreme Court of Ohio, had no reference whatever to the construction of the bank law of 1845, which was enacted many years after this decision was made; and besides, it does not appear, in the report of that case, that the question was even brought to the consideration of the.court, whether the constitution of the state contained any grant of power which .•authorized the legislature, by contract or stipulation, either to limit the legislative control of the state over existing laws, by amendment or repeal, or to abridge the exercise of the legislative power ■over the right of taxation. In the case of the Toledo Bank v. Bond, .above cited, this decision, in 7 Ohio, is fully examined, and the absurd doctrine, that a law granting a charter to a private corporation, is a contract, is fully exposed. In reference to this case of th Commercial Bank of Cincinnati, Mr. Justice Catron, in his very able, dissenting opinion, in the case before us, remarks (16 Howard, 400):
“ The state, in that case, raised no question as to the right of o:io *445, 446 legislature to cede the sovereign power to a corporation, and tie up-the hands of all subsequent legislatures: no such constitutional question entered into the decision ; nor is any allusion made to it 445] in the opinion of the court. It ^merely construed the acts of the assembly, and held that a contract did exist-, on the ground that, by the charter, the bank was taxed four per cent.; and, therefore, the charter must be enforced, as this rate of taxation adhered to the-charter, and excluded a higher imposition.
“It would be most unfortunate for any court, and especially for this one, to hold that a decision affecting a great constitutional consideration, involving .the harmony of the Union (as this case obviously does), should be concluded by a decision in a case where the constitutional question was not raised by counsel; and so far from being considered by the court, was never thought of. Such a doctrine is altogether inadmissible.”
And it may be added that not only was the question of the constitutional power of the legislature of Ohio to abridge or surrender, in part, any of its high trusts of power by contract, neither presented nor decided in that case; but the question of the statutory construction of the bank law of 1845, different in its provision, in relation to taxation, from the special charter of the Commercial Bank, was not before the court, and the consideration of it wholly impossible at that time. And even the concession, that the charter of a private corporation, is a contract, by no means determines that the 60th section of the bank law of 1845 was a contract, or a stipulation in a contract.
' The venerable chief justice of the Supreme Court of the United States gave his reasons for the jurisdiction assumed in this case (16 How. 393), by adopting what he said in the case of the Ohio Life Insurance & Trust Company v. Debolt, where, in relation to this question (16 How. 433), he said:
“It is very true that if there was any controversy about the construction and meaning of the act of 1851, this court would adopt the construction given by the state court. And if that construction did not impair the obligation of a contract as interpreted by this court, there would be no ground for interfering with the judgment. For then the contract, as expounded here, would not be impaired by the state law. But if we were bound to follow not only the interpretation given to the law, but also to the instrument claimed to 446] a contract, and alleged to be violated, there would be nothing left for the judgment and decision of this court. There would be nothing open which a writ of error or appeal could bring here for consider *447 «ation and judgment; and the duty imposed upon this court under this •clause of the constitution would, in effect, be abandoned
Yerily, if there was no contract, there conld have been no- occasion for this solemn duty imposed on that august tribunal! And most certainly, great stretch of authority would be warranted to prevent the direful consequences of “having nothing left for the judgment and decision of that court ” in such a case ! But the inquiry must be indulged, how would “the high duty imposed upon that court under this clause of the constitution be abandoned,” by following the -construction given to this statute of Ohio by the state court? If there was no contract, there could be no conflict with the constitution, and of course no duty in that respect imposed on that court. Is it a part of the “high duty ” of that court to create constructive or fictitious contracts with a view to prqtect corporations in their exclusive privileges ? Has this prohibitory clause of the constitution nothing in view but to protect the charters of corporations? Yery true it is, that there was no controversy about the construction of the law of 1845. That which the chief justice called, “ the instrument claimed to be a contract,” is the bank law of 1845! And why should the federal court be more disinclined to adopt the construction, given' by the state court to the law of 1845, than that of the law of 1851, both being state laws. The reason is given by the chief justice, in the calamitous event, which he said would follow: “ There would be no ground for interference,” — “ nothing left for the judgment and decision of the federal court,”- — ■“ there would be nothing open which a writ of error could bring up for the consideration *and judgment of the federal court!” This would be a most [447 disastrous calamity, and the.result would be that the banks would be compelled to bear an equal burden of taxation in Ohio. The doctrine of the federal court amounts to this : that it is the peculiar and exclusive province of the state court to give the judicial interpretation and construction to the constitution and statutes of the state; but that the Supreme Court of the United States is charged with the great conservative duty of preventing the obligations of ■contracts from being impaired by state laws, and as incident thereto .of protecting the charters of corporations from violation by state legislation. And in the exercise of this great conservative power over the obligations of contracts, that court will assume the power lo construe a state law contrary to the construction given to it by *448 the Supreme Court of the state, when necessary to its protecting-charge over the privileges and immunities "of corporations. i
In conclusion, I must be allowed to say, with all proper deference .for the opinion of the majority of this court, that I am wholly unable to' conceive how this appellate power of the supreme federal court can be admitted in this case, without conceding to the-fullest extent, the supremacy of that tribunal in the determination of the extent of its supervisory power over the state courts. A subordinate court can not be allowed to determine the extent of the jurisdiction or power of a superior and appellate court.
I insist that this obedience to the mandate of the federal court is not justified by precedent under the present constitution in this-state, at least. • This is the first motion ever made in this court for such a proceeding, and for some three years, the determination of it has been delayed by a division of opinion in the court on the. 448] question. And if such prandates *were ever entered, or followed by the Supreme Court of this state, under the former constitution, it was when the question of the power of the federal court was not raised.
Under the full‘conviction, therefore, that the judgment of the Supreme Court of the United States in this case, was coram non judice, and that it is a high duty, which we owe to the sovereignty of the people of Ohio, to disregard it, I must be allowed, with all due respect for the opinion of the majority of this court, to enter my solemn dissent against the entry of the mandate, and the action of this court in conformity thereto.